648 A.2d 1177

COMMONWEALTH of Pennsylvania, Appellee,

v.

John Wesley BROWN, Appellant.

Supreme Court of Pennsylvania.

Argued April 5, 1994.

Decided Oct. 6, 1994.

412

414

David Rudenstein, Philadelphia, for John Wesley Brown.

Catherine Marshall, Alan Sacks, Philadelphia, for Com.

Robert A. Graci, Harrisburg, for Atty. Gen.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE, and MONTEMURO, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

Appellant, John Wesley Brown, was convicted of first-degree murder and sentenced to death.

The record reflects the following facts which form the basis for appellant's conviction. On June 10, 1990, appellant and his father, Wesley Brown, who was then seventy-seven years old, were together in their home in Philadelphia. A quarrel between the two occurred over appellant's use of his father's car for "hacking," that is, an unlicensed taxi service. Appellant shot his father four times with a .38 caliber pistol and left him to bleed to death in their home. A neighbor who heard the shots called the victim's granddaughter; she in turn called her grandfather. Appellant answered the phone and told his niece that her grandfather was outdoors. Appellant placed a .38 caliber revolver next to his father's body and took $400 from his father's wallet, then drove off in his father's car. He disposed of the murder weapon by throwing it out the car window in Maryland en route to Georgia. Two days later appellant was stopped at a road check in Georgia; a computer check of appellant's driver's license disclosed that the license was expired, that the car was stolen, and that appellant was wanted in Pennsylvania for murder. Appellant admitted shooting his father, but claimed it was done in self-defense after his father pointed a .357 magnum pistol at him.

Following appellant's trial, the jury found him guilty of murder of the first degree, robbery, and possessing an instrument of crime. Following the penalty phase of the trial, the jury found that an aggravating circumstance existed, to-wit,

that appellant had been convicted of a prior voluntary manslaughter;[1] the jury also found three mitigating circumstances, namely, that appellant had no significant history of prior criminal convictions, that he acted under extreme mental or emotional disturbance, and that he had some other evidence of mitigation.[2] In balancing the statutory factors, the jury concluded that the aggravating circumstance outweighed the mitigating circumstances, and unanimously reached a verdict of death. This appeal pursuant to 42 Pa.C.S. § 9711(h)(1) followed.

Appellant's first argument is that the evidence was insufficient to sustain the verdict of murder of the first degree. This is an issue we review in every capital case. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The applicable standard of review is whether, viewing all the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences favorable to the Commonwealth, a jury could find every element of the crime beyond a reasonable doubt. *Commonwealth v. Kichline,* 468 Pa. 265, 271, 361 A.2d 282, 285–86 (1976). When a defendant presents evidence that he committed a killing in self-defense, the Commonwealth must disprove such a defense beyond a reasonable doubt. *Commonwealth v. Samuel,* 527 Pa. 298, 303, 590 A.2d 1245, 1247 (1991); *Commonwealth v. Upsher,* 497 Pa. 621, 624, 444 A.2d 90, 91 (1982). In keeping with these standards, the evidence was sufficient to sustain the verdict.

Appellant frequently argued with his father over the use of the latter's car in the hacking business. On the eve of the murder, they quarreled once more, and the victim reported to the police that his car had been stolen. According to the victim's granddaughter, it was because he was afraid to stand up to his son and refuse him the use of the car.

1. 42 Pa.C.S. § 9711(d)(12).
2. Respectively, 42 Pa.C.S. §§ 9711(e)(1), (2), and (8).

In the early post-midnight hours of Monday, June 11, 1990, appellant went to his father's bedroom and shot him four times with a .38 caliber revolver. Medical evidence established that three of four bullets struck the victim, two in the chest and one in the arm, all of them travelling downwards through the victim's body. The bullets injured the victim's lung, aorta, bones and tissues, causing the victim to bleed to death in ten or fifteen minutes. There was a loaded .38 caliber revolver lying near the victim's head when the body was discovered. There was evidence that the gun did not belong to the victim, and, by implication, that appellant took it from his collection of weapons and placed it there after the shooting.

Appellant gave voluntary written statements to authorities in Georgia shortly after his arrest and nine days later when he returned to Pennsylvania after waiving extradition, in addition to his trial testimony. In the first statement, dated June 13, 1990, appellant claimed that when he entered the bedroom, his father had a .357 magnum pistol aimed at him, that he panicked, became angry, and fired his own .38 caliber revolver at the wall. He also admitted that he could have retreated safely through the nearby door if he had not been angry. In appellant's second pretrial statement given on June 22, 1990, he claimed that his father had a .357 magnum pointed at him and said, "I'm going to blow your brains out." Reacting out of anger, appellant started to fall out of the room, pulled his revolver and fired without aiming. At trial, appellant testified that he angrily followed his father to his bedroom during an argument. As he entered the bedroom, his father had a .38 pointed at him. "Instantaneously," acting "out of impulse, reaction," he "dropped to the floor," "spun around," "rolled ... trying to get out of his aim," pulled his own weapon and fired up from the floor without even looking. Then he "ran out of the room." He later explained, "After I fired, I sort of like stumbled out. I just like crawled out. I ran out." He testified that he was angry; he was scared; he was shaking; he was in shock; he was crying.

Minutes later, after he returned to the bedroom, the victim's granddaughter called, and he answered the phone, telling her that her grandfather was outdoors. In fact, the victim was lying on the floor bleeding to death while appellant was taking $400 from his wallet. Then he took his father's car, threw the murder weapon out the window while driving through Maryland, and was apprehended in Georgia.

On cross-examination, appellant testified as follows:

Q. Now, sir, you didn't call the police after you shot your father?

A. No, I didn't.

Q. You live right around the corner from the Albert Einstein Medical Center?

A. Yes.

Q. You didn't call 911 or anything to help your father?

A. No. I froze and I panicked.

Q. When you say you panicked and froze, you knew where you were going, didn't you.

A. I know where I was going. I was scared.

Q. You knew where you were going?

A. Yes.

Q. You thought about where you wre [sic] going, right?

A. I thought about it.

Q. You thought about taking the money from your father and you were able to think then, correct?

A. Yes.

On further cross-examination, asked to explain how, if appellant fired up from the floor, the bullets travelled downwards through the victim's body, as the medical examiner testified, appellant explained:

Q. Well, can you tell—

A. That's what he said, but he actually wasn't there. He wouldn't know.

Q. He is a medical doctor, right?

A. Yes. You know, things happen, you know, he is not God or anything like that, you know, I was there. I didn't see my father hit the floor. I didn't see where I was shooting at.

On redirect examination, appellant placed the blame squarely on his father: "He just should never have pulled the gun on me in the first place. We had a simple argument. There was no reason for that to happen. If he hadn't pulled the gun, this wouldn't have happened. I just reacted out of anger. I reacted out of anger."

Appellant's attack on the sufficiency of the evidence is, in essence, a spurious claim that if his version of events were given credence, he killed in self-defense. In view of the conflicting physical evidence and expert testimony, and in view of the inconsistency of appellant's accounts, it is understandable that the jurors did not credit appellant's testimony. There was more than sufficient evidence to prove every element of the offense and to disprove the self-defense claim beyond a reasonable doubt.

■ Appellant's second argument is that he is entitled to a new trial as the result of ineffectiveness of trial counsel. The threshold inquiry in a claim of ineffective assistance of counsel is whether there is arguable merit to the claim that counsel's performance was substandard or deficient. *Commonwealth v. Durst*, 522 Pa. 2, 559 A.2d 504 (1989). Counsel can never be found ineffective for failing to raise a meritless claim. *Commonwealth v. Williams*, 532 Pa. 265, 274, 615 A.2d 716, 720 (1992). If the claim has arguable merit, then the inquiry shifts to whether the course chosen by counsel had some reasonable basis designed to effectuate his client's interests. *Commonwealth v. Weiss*, 530 Pa. 1, 606 A.2d 439 (1992). If no such reasonable basis is found, then the client must show that counsel's action or inaction prejudiced him. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987). Moreover, the client has the burden of establishing counsel's ineffectiveness because counsel is presumptively effective. *Commonwealth v. McNeil*, 506 Pa. 607, 487 A.2d 802 (1985). These

principles guide our review of appellant's specific allegations of ineffective representation by trial counsel.

■ Appellant asserts that counsel was ineffective in failing to object to the testimony of appellant's niece, Lynette Hudgins, the victim's granddaughter, that she had seen appellant, less than a week before the killing, sitting at home with a gun. Appellant argues that such testimony was unfairly prejudicial and demonstrated a propensity to handle and carry a gun. Such evidence is, nevertheless, admissible, as it tends to prove the means to commit the crime. *Commonwealth v. Evans*, 488 Pa. 38, 44, 410 A.2d 1213, 1216 (1979). Admission of the testimony was particularly proper in this case as appellant threw away the murder weapon, preventing the prosecution from linking it to the murder by ballistic evidence or through eyewitnesses who recognized the gun. Thus an objection would have been futile.

■ Appellant likewise claims that counsel was ineffective in failing to object to the hearsay testimony of the same witness, who testified that the victim did not want appellant to use his vehicle for hacking. The out-of-court statement, however, was not offered for its truth but only for the fact that it was made, and thus was not inadmissible hearsay. *See Commonwealth v. Wright*, 455 Pa. 480, 485, 317 A.2d 271, 274 (1974). Moreover, it was evidence of an argument over the car, which was admissible as evidence of appellant's motive for murdering his father. *Commonwealth v. Covil*, 474 Pa. 375, 382, 378 A.2d 841, 845 (1977). Thus, objecting to the admission of the victim's out-of-court statement would have been futile.

■ Appellant claims that trial counsel was ineffective in eliciting damaging testimony from Commonwealth witness Lynette Hudgins. He asserts that her testimony that he had been like a father to her while she was growing up was damaging to the defense because it bolstered the credibility of the prosecution witness. Despite this assertion, counsel had an obvious reasonable basis for establishing evidence of appellant's good character, arguing in summation that such a

person would not have shot his own father except in self-defense.

■ Appellant likewise claims that counsel was ineffective for failing to object to hearsay testimony of witness Charlena Hudgins, appellant's sister. This witness testified that, years earlier, the victim told her he had left his house because appellant had torn up the house; appellant asserts that the admission of this hearsay testimony was extremely prejudicial because it reflected a propensity for violence. It would, however, have been futile for defense counsel to object to the testimony, for it was not inadmissible hearsay. It was admitted to support the Commonwealth's position that appellant's self-defense claim was a sham and that he had planted a gun near his father's body after killing him. Charlena Hudgins was testifying that the gun discovered near the body was not the victim's gun, which she knew because she had seen his gun years earlier; she remembered the incident because he told her he'd left his home with the gun because his son had torn up their house. The victim's out-of-court statement about his son's violence was thus not admitted for the truth of the statement but because of its effect on the witness, causing her to remember the incident clearly, including the gun the victim brought to her house on that occasion. As the out-of-court statement was not admitted for its truth, it was admissible as an exception to the rule against hearsay. *Commonwealth v. Wright*, 455 Pa. at 485, 317 A.2d at 274. Counsel cannot be found ineffective for failing to raise a meritless claim.

■ Appellant claims trial counsel was ineffective in failing to object to other hearsay by Charlena Hudgins as well. In describing the victim's visit to her home, years before the murder, she stated, "They had been arguing about something, I guess." Nonetheless, the statement was admissible for the reasons the previous testimony was admissible: it was admitted, not for its truth, but to establish the effect on the witness, enabling her to remember a remote incident vividly. Furthermore, the statement could not possibly have prejudiced appellant's defense. The statement did not ascribe to appellant any

fault for the argument. The mere fact that appellant had argued with his father, which his own testimony established was a frequent and routine occurrence, could not possibly have prejudiced him.

██ Appellant challenges his trial counsel's effectiveness with respect to yet another hearsay statement of witness Charlena Hudgins. She testified, in reference to the same occurrence as in the preceding paragraphs, that appellant had threatened to kill his father next time. This argument, however, is totally without support in the record. The witness was not repeating an out-of-court statement of the victim, as appellant asserts, but was repeating appellant's threat to kill his father, made in her presence, and it was therefore not inadmissible hearsay. The threat was also admissible as an admission against appellant. *Commonwealth v. Hoss*, 445 Pa. 98, 112, 283 A.2d 58, 66 (1971).

Appellant claims that trial counsel was ineffective for neglecting to object to still another statement by Charlena Hudgins. He claims she testified that the victim's guns did not appear real to her. He asserts that her statement was prejudicial in that it undermined his self-defense claim. Again, however, appellant misreads the record. The witness testified that *appellant's* guns, rather than the victim's, did not appear to be real. This could not possibly have prejudiced appellant. He himself testified that he shot his father with a real gun; the witness merely created an impression that appellant's guns were less dangerous than they actually were and that his collection of weapons seemed to be a harmless hobby.

██ Appellant also argues that trial counsel was ineffective for failing to object to witness Patrick Peters stating that on the day of the murder, he heard the gunfire and thought that something had happened between appellant and the victim. Appellant claims that counsel should have objected to the admission of this conclusion by the witness. As the Commonwealth points out, however, counsel had a reasonable basis not to object to the statement. The statement, in

context, was either neutral or helpful to the defense. · The witness had testified that he had seen the victim earlier in the day in his car with a gun. His innocuous speculation that something had happened between appellant and his father, therefore, indirectly supported appellant's defense that he shot his father in self-defense. Moreover, the statement was made in explanation of his telephone call to the victim's daughter; such testimony, offered to explain a course of conduct, is admissible. *Commonwealth v. DeHart*, 512 Pa. 235, 254, 516 A.2d 656, 666 (1986), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987).

Appellant next argues that trial counsel should have objected to the cross-examination of Harriet Carter, which allegedly created the impression, through impermissible means, that appellant had lied to the police. Carter had testified that appellant told her his father pulled a gun on him, yet she told the police that appellant claimed his father shot at him. She admitted on cross-examination that appellant never said his father shot at him. Then the transcript reflects that the prosecutor asked her, "But he told that to the police anyway?" She answered yes. Appellant argues that, although it was the witness who falsely claimed that the victim shot at appellant, the prosecutor insidiously made it appear that it was appellant who made the false statement.

The context of the testimony, however, makes it clear that either the transcript is inaccurate and that the question was, "But you told that to the police anyway," [3] or the prosecutor

3. There are many scores of other obvious errors in the transcription of this trial. For example, trial counsel is reported to have said, "The two of them are here in the courtroom and *theya re* armed. This *plan* has shackles on his feet." N.T. 7/25/91, at 1000. The prosecutor purportedly said during summation, "There are two people and two people only who would know what happened here. One is the defendant and one *he* the victim." N.T. 7/22/91, at 974. Preliminary jury instructions: "The evidence in this case comes from the answers to questions by witnesses, perhaps from some *after* evidence which will be introduced also." N.T. 7/17/91, at 490. To clarify where 5331 North 15th Street was, the prosecutor asked, "That's here *Mr.* Philadelphia?" N.T. 7/17/91, at 513. Inquiring about the position of the victim's body, the prosecutor reportedly asked, "Do you know what side he was *his* lying on, if you can recall?" N.T. 7/19/91, at 569. "You have the right to

misspoke while intending to ask, "But you told that to the police anyway." During Carter's cross-examination, the prosecutor repeatedly attacked Carter's credibility by contrasting her trial testimony with the statement she had given the police, then asking her to admit that she had given the police a false statement. It is quite clear from the setting of the challenged question that the prosecutor was asking Carter about her statement to the police, not about appellant's statements. Carter had not been present when appellant made statements to the police and could not have testified about what he told them. Moreover, appellant never told the police that his father shot at him, and it would have been pointless for the prosecutor to ask Carter to accuse appellant of having made such a false statement when he had never made such a statement. It is most likely, if not apparent, therefore, that trial counsel did not object to the question because it was never asked; it appears that the question actually posed was, "But you told that to the police anyway," and trial counsel was not ineffective for failing to object to the question.

Addressing the possibility that the question was asked as recorded in the transcript, "But *he* told that to the police anyway," appellant has failed to establish any possibility of prejudice under the standard of *Pierce, supra.* The jury had heard appellant's two pre-trial statements to the police, which were read into evidence, and nowhere did appellant ever claim that his father had shot at him. The same is true of appellant's trial testimony. In the context of the prosecutor's cross-examination of Harriet Carter, it was obvious that it was *Carter's* prior inconsistent statement which was under attack, not a statement by appellant. If the prosecutor inadvertently misstated the question as it is transcribed, it would have been

remain silent. You do not have to *saying* anything at all." N.T. 7/18/91, at 742. Testifying as to the victim's vital statistics, a witness is reported to have said, "He was *his* a black male, 77 years old; height was five feet eleven inches, with a weight of 152 pounds." N.T. 7/18/91, at 757. The prosecutor asked, "What damage did [the bullet] do when it entered the body before it *existed* ?" N.T. 7/18/91, at 761. "Q. Would you tell the members of the jury the circumstances of that fire damage and in particular the disagreement that you had with your father which *steemed* from the fire?" N.T. 7/19/91, at 825.

obvious to everyone in the courtroom that she meant to accuse *Carter* of falsifying her pretrial statement to the police. There is certainly no likelihood that an objection by defense counsel, to clarify that Carter, rather than appellant, had made the false statement to the police, would have resulted in a different outcome of the trial. *Pierce*, 515 Pa. at 163, 527 A.2d at 977. The outcome of this long trial did not turn on the possible misuse of one word.

Appellant argues that counsel was ineffective for failing to object to allegedly improper cross-examination of appellant. The prosecutor asked appellant why he had tears in his eyes only when testifying but not while committing the crimes. This was proper cross-examination, however. Appellant had injected the issue of his reaction to his father's death; he had described how he had cried after shooting his father and became choked up and began to cry again when he learned that his father had died. The prosecutor was entitled to ask him whether he had tears in his eyes when he shot his father, when he talked to a neighbor after the shooting, and when he spoke to his niece on the telephone while his father lay on the floor bleeding to death. It was proper to attempt to expose a sham in order to permit the jury to evaluate the sincerity of appellant's testimony. It was not ineffective on the part of trial counsel not to object to permissible cross-examination invited by the testimony of appellant himself.

Appellant's next allegation of ineffectiveness is that counsel should have objected to allegedly improper questioning of Detective Harris during Commonwealth rebuttal. He claims that the detective's statement that Carter never told him that appellant worked in maintenance with her was without proper foundation as he never asked her whether she worked with him. This argument is meritless. The detective was testifying about inconsistencies between Carter's trial testimony and the written statement she had given the police during the investigation. Her written pretrial statement that all appellant did for money was hacking clearly contradicted the fact that she worked with him five nights a week on a

maintenance job. There is no requirement that the inconsistency arise in response to a particular question or that the inconsistency be phrased in the same way as the trial testimony it contradicts. A prior statement is admissible for impeachment so long as it is inconsistent with trial testimony. *In re Silverberg,* 459 Pa. 107, 117, 327 A.2d 106, 112 (1974).

Appellant's final claim that trial counsel was ineffective relates to his failure to object to Detective Harris's statement that Harriet Carter was "very thorough when she read through the statement," which appellant argues was an unfounded conclusion. There is no merit to this argument. Carter herself testified that the police gave her an opportunity to read through her statement and that she made whatever corrections she felt were necessary. The detective confirmed that aspect of her testimony and added his observation that she read the statement thoroughly. Such an observation was permissible. If there is doubt, the question is for the jury.

We conclude that all of appellant's claims of ineffective assistance by defense counsel lack merit. In each instance of alleged ineffectiveness, not only did trial counsel act reasonably, but appellant utterly fails to establish that any prejudice might have resulted from trial counsel's representation.

Appellant's next argument is a set of allegations that the prosecutor engaged in gross misconduct during the penalty phase of trial and that trial counsel was ineffective in failing to object, thus requiring a new penalty hearing. Appellant alleges six specific instances of prosecutorial misconduct, none of which has any merit.

■ In proving the aggravating circumstance of prior conviction of voluntary manslaughter, 42 Pa.C.S. § 9711(d)(12), the Commonwealth introduced evidence that appellant had pleaded guilty to a charge of voluntary manslaughter in 1967. It did so by offering the testimony of Detective Gross, who testified about the prior conviction. Appellant asserts that when the prosecutor asked the detective to state the "charge" in the prior homicide case, she

engaged in misconduct inasmuch as a charge is not evidence of a conviction.

This argument is frivolous. The detective testified that the charge was voluntary manslaughter and that appellant pleaded guilty to the charge. A charge followed by a guilty plea constitutes a conviction, and a conviction of voluntary manslaughter satisfies the aggravating circumstance of 42 Pa.C.S. § 9711(d)(12).

Appellant's second allegation of prosecutorial misconduct during the penalty hearing is that the Commonwealth called Detective James Meeley as a witness and introduced a "long-winded" recitation of the facts in appellant's prior manslaughter case, including the reading of appellant's confession therein. Appellant argues that although it is proper to introduce the "essential and necessary facts" of the prior conviction, *Commonwealth v. Beasley*, 504 Pa. 485, 475 A.2d 730 (1984), it is not permissible to explain the "underlying facts" of a prior conviction. *Commonwealth v. Ly*, 528 Pa. 523, 599 A.2d 613 (1991). This court stated in *Ly* that for the prosecutor to explain the underlying facts "would prompt defense counsel to allege that the court committed error in allowing such evidence." *Id.* at 541, 599 A.2d at 621.

Appellant misconstrues the quoted language as a holding that the Commonwealth may not introduce any underlying facts associated with a prior homicide conviction in proving the aggravating circumstance set forth in 42 Pa.C.S. § 9711(d)(12). In this instance, the reading of the confession was not "long-winded." It occupies six pages of transcription in a lengthy trial, with thousands of pages of testimony. The jury is entitled to know the "essential" facts of a prior conviction constituting an aggravating circumstance, and may need to know certain of the "underlying" facts as well.

The jury's weighing of aggravating and mitigating circumstances is a subjective process. The mere existence of one or more aggravating circumstances together with one or more mitigating circumstances does not determine the sentence to be imposed. We have held that balancing aggrava-

ting against mitigating circumstances is not a quantitative process—that is, if more aggravating than mitigating circumstances are found, the jury is not required to impose a death sentence; likewise, if more mitigating than aggravating circumstances are found, the jury is not necessarily precluded from imposing a death sentence. *Commonwealth v. Peoples*, 536 Pa. 326, 329–333, 639 A.2d 448, 450–51 (1994); *Commonwealth v. Billa*, 521 Pa. 168, 187–88, 555 A.2d 835, 845 (1989). In balancing aggravating and mitigating circumstances, the jury must weigh the relative significance of each circumstance, and to do so, it must know more than the mere existence of the circumstance; it needs some idea of the underlying facts in the matter.

In this case, the circumstances of the prior manslaughter were particularly relevant. Appellant had contended during the trial that he killed his father in a fit of anger; similarly, in his confession in the prior manslaughter case, appellant explained that he had chased the victim and stabbed him in the back because he was angry. To enable the jury to weigh aggravating and mitigating circumstances meaningfully, it was necessary and permissible for the Commonwealth to prove the similarity between the two homicides. As the prior confession was admissible evidence, there was no prosecutorial misconduct in presenting it, and no ineffectiveness on the part of trial counsel in declining to object to its admission.

Appellant's third allegation of prosecutorial misconduct is an objection to the prosecutor's use of the adjective "brutal" in describing the murder of appellant's father. Appellant concedes that a prosecutor has some oratorical license and may exhibit some passion in closing argument, *Commonwealth v. Baker*, 531 Pa. 541, 614 A.2d 663 (1992), but argues that use of the word "brutal" was equivalent to arguing the existence of torture, an aggravating circumstance which was not charged.

We regard this argument as frivolous. The record contains evidence establishing that appellant shot his father three times and left him to bleed to death slowly, without seeking

readily available emergency medical treatment. "Brutal" means, inter alia, grossly ruthless or unfeeling, cruel, cold-blooded, harsh, or severe. Webster's Ninth New Collegiate Dictionary (1985). Such oratory is not equivalent to arguing that the jury should find the aggravating circumstance of torture. The single use of the word "brutal" was relatively mild language well within the boundaries afforded counsel in closing argument, and, indeed, appears to accord with the facts of the case. *See Commonwealth v. Marshall*, 523 Pa. 556, 573, 568 A.2d 590, 598 (1989) (permissible to refer to defendant as "a systematic, brutal, calculating killer.")

Appellant's next allegation of prosecutorial misconduct during the penalty hearing is the prosecutor's reference during closing argument to "aggravating circumstances" in the plural when only one aggravating circumstance was charged. Appellant presents no argument in support of this allegation, so the issue is waived.[4]

▮▮ Appellant's fifth assertion of prosecutorial misconduct is the prosecutor's argument that appellant "claims that he has no significant history of a felony conviction." This argument, too, borders on the frivolous. Appellant apparently claims that the prosecutor, learned in the law, was well aware of the difference between criminal convictions and felony convictions. The mitigating circumstance at issue, 42 Pa.C.S. § 9711(e)(1), refers to a "significant history of prior criminal convictions." In the context of the prosecutor's closing argument, however, the difference between a criminal conviction or a felony conviction was without import, as there was no dispute that appellant's history of convictions consisted only of one prior manslaughter. The question was the significance or

4. The transcript reads: "Let me suggest to you here that the aggravating circumstances, very, very serious, because *it* weighs heavily...." N.T. 7/24/91, at 1067 (emphasis added). It appears that the transcription of the argument is erroneous and should read: "... the aggravating circumstance is very, very serious...." In any event, the isolated use of the plural could have had no prejudicial effect as the jury was well aware that only one aggravating circumstance was presented for its consideration, which obvious fact was reinforced by the verdict slip containing only the single relevant aggravating circumstance set forth in 42 Pa.C.S. § 9711(d)(12).

weight to be accorded the single felony conviction. We cannot perceive any sinister prosecutorial motive in referring to "felony convictions" in closing argument. Moreover, prejudice is glaringly absent in view of the jury's finding that the mitigating circumstance of 42 Pa.C.S. § 9711(e)(1) was indeed present to ameliorate appellant's culpability in this case.

Appellant's final allegation of prosecutorial misconduct in the penalty phase is a challenge to the prosecutor's statement during closing argument that appellant "hopes to be held unaccoutable [sic] for his actions...." Appellant argues that this was false, because he hoped to receive a sentence of life imprisonment in full accountability for his actions. This, too, is a frivolous argument. The thrust of the prosecutor's argument was simply that appellant hoped to avoid full accountability for his behavior. Accountability means acceptance of the consequences of one's actions; in seeking to avoid the death penalty, which the crime and the circumstances justified, appellant was arguably attempting to evade the full consequences of his crime. It was certainly fair argument on the part of the prosecutor. *See Commonwealth v. Basemore*, 525 Pa. 512, 528, 582 A.2d 861, 869 (1990), *cert. denied*, 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992).

No prosecutorial misconduct occurred in the penalty phase of appellant's trial. It follows that no ineffectiveness on the part of trial counsel resulted in prejudice to appellant during the penalty hearing.

Appellant's next argument is that prosecutorial misconduct during the trial in the cross-examination of appellant resulted in prejudice which requires a new trial. The prosecutor asked the defendant, "Was your father drunk the night he got murdered?" Appellant argues that it was intentional misconduct by the prosecutor and grossly prejudicial to the appellant for the prosecutor to refer to the "murder" of the victim before the jury determined that a murder had been committed.

Following a request for a mistrial, defense counsel received a cautionary instruction. The instruction made clear that the

issue of whether a murder had been committed was the ultimate question for the jury to decide. Even without the court's careful and lengthy instruction, the jurors must have understood that the issue of whether the killing was a murder was for them to decide and that the prosecutor's question did not foreclose them from deciding that issue. More important, the obvious point of the question, as is clear from the questions asked immediately afterwards, was to establish whether the victim was drunk at the time of the alleged argument, not to establish that the killing was a murder. *See Commonwealth v. Morgan,* 273 Pa.Super. 124, 416 A.2d 1121 (1979). The trial court's extensive cautionary instruction made this clear beyond all doubt. The trial court did not err in refusing appellant's request for a mistrial.

Appellant's next argument is that the death penalty statute, 42 Pa.C.S. § 9711, is unconstitutional because it does not allow for an appeal of jury determinations in which aggravating circumstances are found to outweigh mitigating circumstances. The essence of appellant's claim is not that the jury wrongly assessed the significance of the aggravating and mitigating circumstances in his case, but that his appellate rights were unconstitutionally abridged in that this court does not have the jurisdiction to consider the question of whether the jury erred "as a matter of law" in weighing the aggravating and mitigating circumstances.

This is incorrect. While this court does not perform a weight-of-evidence analysis of the jury's balancing of aggravating and mitigating circumstances, it nevertheless reviews the sentence pursuant to 42 Pa.C.S. § 9711(h)(3)(i), which requires review for "passion, prejudice or any other arbitrary factor." This is tantamount to reviewing the fairness of the jury's evaluation of the aggravating and mitigating circumstances "as a matter of law." [5]

5. This precise issue was analyzed at greater length and rejected in *Commonwealth v. Thompson,* 538 Pa. 297, 648 A.2d 315 (1994) decided *eo die.*

■ The next argument raised by appellant is that his death sentence is excessive or disproportionate and must be replaced with a sentence of life imprisonment pursuant to 42 Pa.C.S. § 9711(h)(4). The gist of the argument is that the jury found only one aggravating circumstance and three mitigating circumstances, so that "any rational weighing process [among reasonable people] would have resulted in a sentence of life in prison and not the death sentence." He argues that the jury was impassioned and prejudiced because he murdered his father, and the death sentence was impermissibly based on the ground that the victim was his father, which cannot be an aggravating circumstance, rather than on a statutorily permitted aggravating circumstance.

■ The obvious defect in this argument is that there is no evidence to support it. The Commonwealth correctly points out that the jury's finding of various mitigating circumstances does not establish the relative significance of such circumstances. It may well be that the finding of extreme mental or emotional disturbance, 42 Pa.C.S. § 9711(e)(2), carried little weight in the minds of the jurors because the same emotional reaction was appellant's excuse for stabbing his prior manslaughter victim in the back. It may be that the finding of an absence of a significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1), was not particularly impressive to the jurors when contrasted with the aggravating factor of a prior manslaughter conviction. In any event, there is nothing in the record to support appellant's assertion that the sentencing verdict was the result of passion, prejudice, or other arbitrary factor. *See* 42 Pa.C.S. § 9711(h)(3)(i). As to appellant's allegation that his death sentence is disproportionately severe in comparison to similar cases, violating 42 Pa.C.S. § 9711(h)(3)(iii), *see Commonwealth v. Zettlemoyer,* 500 Pa. at 63, 454 A.2d at 961, we have reviewed the sentence imposed on appellant in light of sentencing data compiled and monitored by the Administrative Office of Pennsylvania Courts. *See Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984). There is no excess or disproportionality in the sentence imposed.

 Appellant's penultimate argument is that he is entitled to a new penalty hearing due to appellant's presence at counsel table wearing shackles during the giving of the jury instructions following the penalty hearing. Although the argument is unstated, appellant presumably claims that the jurors might have seen the foot shackles and unfairly inferred that appellant was deemed to be a violent person in need of restraint.

In *Commonwealth v. Jasper*, 531 Pa. 1, 610 A.2d 949 (1992), we considered the circumstances in which it is appropriate for a trial judge, in the exercise of discretion, to permit restraint of a defendant in a criminal trial. In that case, as in this, there was a dispute over whether the shackles were visible from the jury box. The relevant considerations are:

... [I]t is well-settled under common law and constitutionally as incident to a fair trial without prejudice that defendants appear free from shackles or other physical restraints.... [Nevertheless,] there are exceptional circumstances when the employment of such techniques are [sic] an acceptable practice where such "restraint [is] reasonably necessary to maintain order."

Exceptional circumstances often have been found in sister jurisdictions as well where ... the court has reason to believe that an unrestrained defendant might attack others.

... [W]here the trial evidence shows that a violent defendant was incarcerated at the time of trial, no prejudice occurs even when restraints are visible to the jury.

... [A]n appellant who already had been convicted as a murderer by the same jury could not have been prejudiced at anytime [sic] or circumstances by [the defendant] appearing before them in restraints.... Appellant waived his claims to error by failing to question the jury on the subject of restraints or to ask for cautionary instructions.

*Id.* at 12–14, 610 A.2d at 955–56 (citations omitted). In light of this standard, we think the trial court properly exercised its discretion, and appellant has failed to create a record which might substantiate his assertion of prejudice.

When defense counsel objected to the shackles, before the jury returned to the courtroom, the judge countered with the opinion that the jury could not see appellant's feet. Defense counsel argued: "You don't think they can, but the point is that it is a possibility, Judge. It is possible that one or two or four or hover [sic] many of the jurors could at some point look over and see Mr. Brown's feet." The trial judge then went to the jury box and from various vantage points concluded that jurors would be unable to see appellant's feet clearly and would not see the shackles unless looking for them. The court asked the sheriff for an explanation of the decision to place appellant in shackles and was informed that appellant had refused to obey an order of the sheriff and attempted to take control, and that the sheriff believed that restraint was necessary to insure the peace and safety of the courtroom. Further, appellant offers no evidence that any juror saw the shackles or was influenced by the observation. *See id.* at 14, 610 A.2d at 956; *Commonwealth v. Davis,* 466 Pa. 102, 116, 351 A.2d 642, 649 (1976). We have no reason to conclude that the trial court abused its discretion in permitting appellant to be shackled during the conclusion of the penalty hearing.

█ Appellant's final argument is that the verdict is against the weight of the evidence, requiring the award of a new trial. A trial court will

grant a new trial when it believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice. Although a new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion, a new trial should be awarded when the jury's verdict is *so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.*

*Thompson v. City of Philadelphia,* 507 Pa. 592, 598, 493 A.2d 669, 672 (1985) (citations omitted, emphasis added). A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Appellate review, therefore, is a review of the exercise of

discretion, not the underlying question whether the verdict is against the weight of the evidence. It is

the duty of an appellate court to give the gravest consideration to the findings and reasons advanced by the trial judge.

We have repeatedly said that we will not reverse the grant [or denial] of a new trial, unless there was a clear abuse of discretion, or an error of law which controlled the outcome of the case.

. . . "One of the least assailable reasons for granting [or denying] a new trial is the lower court's conviction that the verdict was [or was not] against the weight of the evidence and that new process was [or was not] dictated by the interests of justice. With reasons for this action given or appearing in the record, only a palpable abuse of discretion will cause us to overturn the court's action." In determining whether or not the grant of a new trial constituted an abuse of discretion, it is our duty to review the entire record.

An appellate court by its nature stands on a different plane than that of a trial court. Whereas a trial court's decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence, an appellate court's review rests solely upon a cold record. Because of this disparity in vantage points an appellate court is not empowered to merely substitute its opinion concerning the weight of the evidence for that of the trial judge. Rather our court has consistently held that appellate review of the trial court's grant of a new trial is to focus on whether the trial judge has palpably abused his discretion, as opposed to whether the appellate court can find support in the record for the jury's verdict. . . .

In reviewing the entire record to determine the propriety of a new trial, an appellate court must first determine whether the trial judge's reasons and factual basis can be supported. Unless there are facts and inferences of record that disclose a palpable abuse of discretion, the trial judge's reasons should prevail. It is not the place of an appellate

court to invade the trial judge's discretion any more than a trial judge may invade the province of a jury, unless both or either have palpably abused their function.

To determine whether a trial court's decision constituted a palpable abuse of discretion, an appellate court must "examine the record and assess the weight of the evidence; not however, as the trial judge, to determine whether the preponderance of the evidence opposes the verdict, but rather to determine whether the court below in so finding plainly exceeded the limits of judicial discretion and invaded the exclusive domain of the jury." Where the record adequately supports the trial court, the trial court has acted within the limits of its judicial discretion.

*Id.* at 598–600, 493 A.2d at 672–73 (citations omitted).

There is a real and material difference between appellate review of the exercise of discretion by a trial judge, on the one hand, and appellate review of the record to adjudge whether the preponderance of the evidence opposes the verdict, on the other, although the distinction may be a fine one. Thus a trial court's denial of a motion for new trial because the verdict is not opposed to the weight of the evidence is "one of the least assailable" of its rulings.

Failure to distinguish clearly between appellate review of a trial court's exercise of discretion and appellate review of the weight of the evidence has resulted in misinterpretation of recent opinions of this court. The Commonwealth asserts in its brief that denial of a claim that the verdict is against the weight of the evidence cannot be appealed, even in capital cases, citing *Commonwealth v. Karkaria,* 533 Pa. 412, 418–19 n. 3, 625 A.2d 1167, 1170 n. 3 (1993); *Commonwealth v. Wallace,* 522 Pa. 297, 315, 561 A.2d 719, 728 (1989); and *Commonwealth v. Nelson,* 514 Pa. 262, 271 n. 3, 523 A.2d 728, 733 n. 3, *cert. denied,* 484 U.S. 928, 108 S.Ct. 293, 98 L.Ed.2d 253 (1987). In *Karkaria,* we stated:

The appellant characterizes his questions presented on appeal as challenges to the "weight" and sufficiency of the evidence. An allegation that the verdict is against the

"weight" of the evidence is a matter to be resolved by the trial court:

> While there may be some legitimacy for a trial court, who [sic] has also observed the witnesses as they testified, to consider the weight of the evidence and to that extent review the jury's determination of credibility, there is surely no justification for an appellate court, relying upon a cold record, to exercise such a function.

*Commonwealth v. Farquharson*, 467 Pa. 50, 59–60, 354 A.2d 545, 550 (1976).

*Commonwealth v. Karkaria*, 533 Pa. at 418–19 n. 3, 625 A.2d at 1170 n. 3. Similarly, in *Commonwealth v. Nelson*, 514 Pa. at 271 n. 3, 523 A.2d at 733 n. 3 (citations omitted), we stated:

> Unlike the challenge of legal sufficiency of the evidence, the complaint that the verdict was against the weight of the evidence requires an assessment of the credibility of the testimony offered by the Commonwealth. It is a rule of this Commonwealth that an appellate tribunal should not entertain a challenge to the weight of the evidence since their examination is confined to the "cold record." However, where the penalty of death is imposed we will consider such a complaint.

The prohibition is upon appellate consideration of the weight of the evidence and concomitant review of the jury's determination of credibility, not upon appellate review of a trial court's exercise of discretion in deciding a new trial motion which alleges that a verdict is against the weight of the evidence.

The Superior Court perceived the distinction in *Commonwealth v. Murray*, 408 Pa.Super. 435, 597 A.2d 111 (1991). In assessing this court's statements in *Commonwealth v. Nelson* and *Commonwealth v. Wallace, supra*, the Superior Court concluded that

> we may review the trial court's exercise of its discretion in denying a motion for a new trial based on a challenge to the weight of the evidence. The law in this Commonwealth has long been that a new trial may be ordered "on the ground

that the verdict is against the weight of the evidence, when the jury's verdict is so contrary to the evidence as to shock one's sense of justice, and the award of a new trial is imperative so that right may be given another opportunity to prevail."

. . . .

The exercise of discretion by the trial judge in denying a motion for new trial based on a challenge to the weight of the evidence is not unfettered. The need for appellate review was acknowledged by the Supreme Court in *Commonwealth v. Powell,* 527 Pa. 288, 590 A.2d 1240 (1991). In holding that a trial court could grant a new trial "in the interest of justice," the Court, per Nix, C.J., observed:

> [w]hile the scope of a trial court's discretionary powers to deal with the factual circumstances it confronts is broad, it is not unlimited. It necessarily follows that the requirement that appellate courts defer to that exercise of discretion is not without limitation either. The propriety of such an exercise of discretion may be assessed by the appellate process when it is apparent that there was an abuse of that discretion.

527 Pa. at 297, 590 A.2d at 1244.

The decisions in *Commonwealth v. Wallace, supra,* and *Commonwealth v. Nelson, supra,* did not refer to nor purport to overrule the line of cases in Pennsylvania in which appellate courts have reviewed the exercise of the lower court's discretion in weighing the evidence. *An appellate court has the duty to review the trial court's denial of a defendant's motion for a new trial on the grounds that the verdict was against the weight of the evidence. The purpose of that review is to determine whether the trial court abused its discretion and not to substitute this Court's judgment for that of the trial court.*

*Commonwealth v. Murray,* 408 Pa.Super. at 439–40, 597 A.2d at 113–14 (citations omitted, emphasis added).

Within this narrowly circumscribed scope of review, it is evident that the trial court did not abuse its discretion in

440

denying appellant's motion for new trial on the ground that the verdict was against the weight of the evidence. As is all too common in trial practice, appellant's post-trial motions presented only a boilerplate challenge to the "sufficiency and weight of the evidence," neglecting to differentiate the differing considerations inhering in the different challenges, and neglecting to specify what preponderant evidence was overlooked by the jury in reaching a verdict of guilt allegedly against the weight of the evidence. Thus the trial court, in denying the motion based on the sufficiency and weight of the evidence, did not review the evidence at length. In his appellate brief, appellant again fails to specify how the verdict was against the weight of the evidence, referring merely to contradictory evidence presented by the Commonwealth and by appellant. There is nothing in the record which was likely to shock the trial court's sense of justice and cry out for a new trial in order to permit justice to prevail. We conclude that the trial court did not abuse its discretion in denying the motion for a new trial.

Accordingly, the sentence must be affirmed.

Judgment of sentence affirmed.[6]

NIX, C.J., joins the opinion of the court and files a concurring opinion.

MONTEMURO, J., is sitting by designation.

NIX, Chief Justice, concurring.

I join in the majority's opinion. However, I write separately because of the majority's characterization of certain testimony complained of by Appellant as being an exception to the hearsay rule. This testimony was incorrectly characterized as an exception to the hearsay rule. This testimony was not hearsay.

Witness Charlena Hudgins testified that the victim told her that Appellant had torn up the house and that the victim left

6. The Prothonotary of the Supreme Court is directed to transmit to the Governor the complete record in this case. 42 Pa.C.S. § 9711(i).

the house as a result. The majority correctly states that "[t]he victim's out-of-court statement about [Appellant]'s violence was thus not admitted for the truth of the statement but because of its effect on the witness...." Op. at 422. The majority goes on to state that "[a]s the out-of-court statement was not admitted for its truth, it was admissible as an exception to the rule against hearsay." *Id.* (citation omitted). Where an out-of-court statement is not admitted to prove the truth of what was said, the hearsay rule does not apply to that statement. *Commonwealth v. Fultz,* 478 Pa. 207, 212–13, 386 A.2d 513, 515 (1978) (citing *Commonwealth v. Wright,* 455 Pa. 480, 485, 317 A.2d 271, 273 (1974)); *see also* 6 Wigmore, Evidence § 1766 (Chadbourn rev.1976). As Ms. Hudgins' testimony regarding the victim's out-of-court statement that he left his home because of Appellant's behavior was not offered for its truth but for the effect it had on Ms. Hudgins, it is not an exception to the hearsay rule; rather, it is not hearsay.