J-S37021-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MICHAEL ANTHONY MARTIN, | |
| Appellant | No. 1371 WDA 2015 |

Appeal from the Judgment of Sentence May 22, 2015
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0003982-2013

BEFORE:  GANTMAN, P.J., SHOGAN and LAZARUS, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JUNE 22, 2016**

Appellant, Michael Anthony Martin, appeals from the judgment of sentence entered following his conviction of first degree murder.  We affirm.

The trial court summarized the factual and procedural history of this case as follows:

FACTUAL HISTORY

The charges in this case arose from the stabbing death of Earl Weygandt, whose body was located on August 7, 2013 in a Jeep Grand Cherokee parked on the berm of Pennsylvania Route 31 in Donegal Township, Westmoreland County.  The Pennsylvania State Police discovered Mr. Weygandt's body after they received a report that the vehicle was on fire and that someone appeared to be inside.  The evidence presented at trial established that on August 7, 2013, State police arrived at the scene, and a preliminary investigation was conducted.  After identifying the victim, the police were dispatched to 3 Daily Avenue in Charleroi, the residence of Mr. Weygandt's wife.  Their daughter, Jeannie Lynn Martin and her husband, [Appellant], lived in the basement in Mrs. Weygandt's home.  Mr. Weygandt

lived alone in a camper that was parked at the Roaring Run Resort. Upon arrival, Pennsylvania State Police Trooper Isaac Lanham began questioning Mr. Weygandt's wife, his stepdaughter, and [Appellant]. (Trial Transcript "TT" 1/5/15-1/9/15; 1/12/15 295). At trial, Trooper Lanham testified that [Appellant] relayed to him that on August 7, 2013, he was doing an electrical job in Uniontown and that he had arrived at the residential job site at approximately 1:00 p.m. with a man by the name of Mike Russo. (TT 302-303). [Appellant] told Trooper Lanham that he and Mr. Russo worked there until about 8:00 pm. (TT 304). Trooper Lanham testified that [Appellant] related that due to his driver's license being suspended, he and Mr. Russo took the long way home. (TT 305). [Appellant] described his route as having driven through the City of Uniontown, accessing State Route 40, then driving eastbound on Route 40 to Ohio Pyle, which took him to State Route 31. (Id.) Trooper Lanham testified that [Appellant] indicated that he made it to Mount Pleasant but reported that his car broke down. [Appellant] then told Trooper Lanham that he called Mr. Weygandt at 9:25 p.m. to ask for a ride or a jump. (TT 306.) [Appellant] said that while he was waiting for Mr. Weygandt, someone came and picked Mr. Russo up and took him to Monessen. Additionally, [Appellant] told Trooper Lanham that eventually his friend, Jeff Ritenour, came and jumped his car battery and he drove back to Charleroi. (TT 305-307).

State police later interviewed Mr. Russo and Mr. Ritenour about the incident. Initially, both Mr. Russo and Mr. Ritenour confirmed [Appellant's] account. Later in the day, State Police questioned Mr. Russo and Mr. Ritenour a second time; during the second interview, [b]oth Russo and Ritenour indicated that [Appellant] came to them and asked them to cover for him. Mr. Ritenour testified that he initially lied to the police and said that [Appellant] was at his home on the night of the incident, but when they questioned him a second time, he told them that [Appellant] did not stay at his house. (TT 419-422).

After acquiring this information, the state police questioned [Appellant] a second time; however, [Appellant] maintained his story. (TT 620). Trooper Lanham then asked [Appellant] if he would come to the state police barracks in Greensburg for further questioning, and he complied. (TT 625). At trial, evidence was introduced in the form of an audio visual recording of a statement that [Appellant] gave to the police in

which he confessed to stabbing Mr. Weygandt. (TT 610, 629). [Appellant] argued that he was acting in self-defense. The record revealed that Mr. Weygandt was stabbed a total of nine times. Matthew Zevoteck, the security guard at Roaring Run where Mr. Weygandt lived testified to a prior incident on August 5, 2013. Mr. Zevoteck testified that Mr. Weygandt called the security guard to report that someone was banging on his door and windows. Mr. Zevoteck drove up to Mr. Weygandt's lot and found [Appellant] sitting at the picnic table on Mr. Weygandt's trailer lot saying that his car had broken down. (TT 225-247).

Glenn Bard, the Chief Technical Officer of PATCtech testified that he reviewed three sets of cell phone records that had been obtained by investigators during the investigation. (TT 529). Mr. Bard testified that he reviewed the pinging of Mr. Weygandt's and [Appellant's] cell phones and was able to determine communication between the two cell phones and the locations of each cell phone during the incident. (TT 529-554). [Appellant] elected not to testify at trial.

PROCEDURAL HISTORY

On or about August 8, 2013, [Appellant] was arrested and charged with Criminal Homicide and Murder of the First Degree. After the preliminary hearing, the First Degree Murder Charge was held for court, and the Criminal Homicide charge was amended to Murder of the Third Degree. [Appellant] was charged as follows:

1. Count One: Murder of the First Degree, in violation of 18 Pa.C.S.A. § 2502(a).

2. Count Two: Murder of the Third Degree, in violation of 18 Pa.C.S.A. § 2502(c), 1st degree felony.

On January 5, 2015, [Appellant] proceeded to a jury trial before this [h]onorable [c]ourt. During trial, [Appellant] was represented by Attorney Brian Aston. Testimony began on January 5, 2015 and lasted until January 9, 2015. On January 12, 2015, the jury returned a verdict of guilty of murder of the first degree. On March 26, 2015, [Appellant] was sentenced at Counts One and Two to a mandatory sentence of life in prison without the possibility of parole at a State Correctional

- 3 -

Institution. On March 27, 2015, [Appellant] timely filed Post-Sentence Motions. On March 31, 2015, Mr. Aston withdrew as counsel, and on the same date, this Court appointed Attorney Tim Andrews to represent [Appellant]. On May 22, 2015, this Court entered an order amending the sentence dated March 26, 2015 to reflect that [Appellant] was convicted [and sentenced] on Count One alone. One June 23, 2015, [Appellant] filed Amended Post-Sentence Motions. A hearing on the Post-Sentence Motions was held on August 18, 2015, and all Post-Sentence Motions were denied. On August 31, 2015, [Appellant] filed a timely Notice of Appeal to the Superior Court. On September 14, 2015, this Court received the docketing statement from the Superior Court accepting the appeal.

Trial Court Opinion, 11/3/15, at 1-4. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

I. DID THE TRIAL COURT ERR IN PERMITTING THE INTRODUCTION OF MULTIPLE AUTOPSY PHOTOGRAPHS WHEN THEY WHERE [sic] OF LITTLE TO NO PROBITIVE [sic] VALUE GIVEN THE ADMISSION OF THE DEFENDANT AND THE OTHER EVIDENCE?

II. DID THE TRIAL COURT ABUSE IT'S [sic] DISCRETION IN DETERMINING THAT THE VERDICT OF THE JURY WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE IN THAT THE JURY FAILED TO GIVE ANY WEIGHT TO SIGNIFICANT EVIDENCE OF SELF-DEFENSE?

Appellant's Brief at 4.

Appellant first argues that he is entitled to a new trial because the trial court erred in admitting certain photographs into evidence. Appellant's Brief at 9-13. Specifically, Appellant contends that the photographs of the victim's autopsy were inflammatory and graphic and would have so inflamed

the minds of the jurors that they would not be impartial with regard to Appellant's claim of self-defense.

Before addressing the merits of Appellant's claim, we must determine whether Appellant properly has preserved the issue for our consideration. It is well settled in Pennsylvania that a party must make a timely and specific objection at trial in order to preserve an issue for appellate review. Pa.R.A.P. 302(a); **see also Commonwealth v. Montalvo**, 641 A.2d 1176, 1185 (Pa. Super. 1994) (citation omitted) ("In order to preserve an issue for review, a party must make a timely and specific objection at trial"). Failure to do so results in waiver of that issue on appeal. **See** Pa.R.A.P. 302(a).

With respect to preserving challenges to the admission or exclusion of evidence, Pa.R.E. 103 addresses rulings on evidence and requires a contemporaneous objection in order to preserve a claim of error in the admission of evidence and provides, in relevant part, as follows:

> **(a) Preserving a Claim of Error.** A party may claim error in a ruling to admit or exclude evidence only:
>
> (1) if the ruling admits evidence, a party, on the record:
>
>> (A) makes a timely objection, motion to strike, or motion *in limine*; and
>>
>> (B) states the specific ground, unless it was apparent from the context. . . .

Pa.R.E. 103(a). However, Pa.R.E. 103 further provides that once the trial court enters a **definitive ruling** on the record, either before or during trial,

"a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Pa.R.E. 103(b).

Our review of the certified record reflects that the Commonwealth called Trooper Richard Nuttall of the Pennsylvania State Police to testify regarding his responsibility of attending the autopsy of the victim performed by Doctor Cyril Wecht. N.T., 1/5-12/15, at 472-493. Trooper Nuttall testified that part of his purpose in attending the autopsy was to take photographs as it was performed. *Id*. at 473. Before the Commonwealth even began questioning the trooper about the photographs or attempted to introduce the photographs into evidence, defense counsel requested to approach the court, and a sidebar was conducted. *Id*. at 475. At the sidebar, defense counsel argued that the photographs, marked as Commonwealth Exhibits 39 through 49, were overly graphic and that it would be prejudicial and inflammatory to introduce them into evidence. *Id*. at 475-476. After the trial court dismissed the jurors, Appellant's counsel made the following argument to the trial court:

> Your Honor, I do concede that there is a jury instruction wherein the jury can infer intent to kill whenever a deadly weapon is utilized on a deadly part of the body. I don't believe that it's necessary to show them graphic photos of an injury that was inflicted by a knife when you can say he was stabbed in the chest that pierced his heart, he was stabbed in the side of the neck and his trachea was severed. I mean, the jury understands those are vital parts of the body. This is about whether or not it's absolutely necessary to show the jury this evidence or whether it's overly inflammatory. And I believe that there's less inflammatory ways for the Commonwealth to be allowed to make their argument.

*Id*. at 479-480.

The trial court then took a brief recess to review the photographs in question. *Id*. at 480. The proceedings then reconvened in the judge's chambers, and the trial judge specifically went through each of the photographs in question and discussed his determination regarding their admissibility. *Id*. at 480-486. Indeed, the trial court reconvened with the following comment:

> I've reviewed the pictures, and I do agree with [the District Attorney] that the jury is entitled to see the pictures. However, it doesn't make sense to show them duplicates of the pictures. So I'm going to limit the photographs, and I'm going to need your help to tell me what some of these pictures of the vital organs are exactly because I think they're duplications.

*Id*. at 480-481. Subsequently, the trial judge and the District Attorney reviewed each photograph on the record, and the trial court specifically excluded Commonwealth Exhibits 39, 40, 46, and 47. *Id*. at 481-486. The trial court permitted the remaining photographs to be shown to the jury. At no time did Appellant's counsel make any objection regarding the trial court's evidentiary determination with regard to particular photographs.

Thereafter, the proceedings reconvened in the courtroom before the jury, at which time Trooper Nuttall was presented with Commonwealth Exhibits 38, 41, 42, 43, 44, 45, 48, and 49. *Id*. at 488. Specifically, the following transpired:

> [District Attorney]: Do [the photographs] show the injuries to [the victim] as well as the damage that was done to his clothing?

[Trooper Nuttall]: That is correct.

[District Attorney]: And are they fair and accurate depictions of his physical injuries as well as his clothing?

[Trooper Nuttall]: Yes.

> [DISTRICT ATTORNEY]: Your Honor, I'd move to admit those exhibits.
>
> THE COURT: [Defense counsel]?
>
> [DEFENSE COUNSEL]: **No objections.**
>
> THE COURT: They are admitted.

*Id*. at 488-489 (emphasis added).

We conclude that, although he lodged an anticipatory objection prior to the Commonwealth presenting the photographic exhibits to the witness, Appellant's counsel failed to make a timely and specific objection to the photographs at the time that they were actually moved for admission. Accordingly, while it might have been prudent for defense counsel to make an anticipatory objection before the evidence was admitted, we are left to conclude that his statement of "No objections" when prompted by the trial court resulted in waiver of this issue for appellate review.[1]

---

[1] We further note that after Appellant was afforded some relief, *i.e.*, through the exclusion of certain photographs and the fact that the trial court directed the victim's face be covered in particular photographs, Appellant still failed to raise an objection.

Furthermore, even if this issue had not been waived, we would conclude that it lacks merit. As a panel of this Court observed in **Commonwealth v. Hetzel**, 822 A.2d 747, 765 (Pa. Super. 2003), "[t]he viewing of photographic evidence in a murder case is, by its nature, a gruesome task." In **Commonwealth v. Robinson**, 864 A.2d 460 (Pa. 2004), our Supreme Court aptly summarized the law to be applied in these circumstances as follows:

> It has been a steadfast principle of our jurisprudence that pictures of the victim are not *per se* inadmissible. In relation to admissibility of these photographs, we have promulgated the following test:
>
> > [A] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. If an inflammatory photograph is merely cumulative of other evidence, it will not be deemed admissible.
>
> "The admissibility of photos of the corpse in a homicide case is a matter within the discretion of the trial court, and only an abuse of discretion will constitute reversible error." As we also explained . . . :
>
> > A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no

need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt. Further, the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs.

*Robinson*, 864 A.2d at 501-502 (citations omitted).

The trial court addressed this issue as follows, which we adopt as our own:

During a sidebar, the Commonwealth moved to admit twelve autopsy photographs of Earl Weygandt. [Appellant's] counsel objected to the admissibility arguing that the photographs were "overly graphic" and "overly prejudicial and inflammatory." (TT 475-476). The trial court carefully considered the photographs and took great lengths in limiting and minimizing any prejudicial effect to [Appellant]. Exhibits 39, 40, …, 46, and 47 were excluded due to duplication or their inflammatory nature. Exhibits 38, 41, [42,] 43, 44, 45, 48, and 49 were admitted with the limitation that the Commonwealth was required to redact the decedent's face in the photographs. This was done to, both, preserve the dignity of the victim and to reduce prejudice to [Appellant]. (TT 473-436). The remaining photographs or portions of photographs clearly demonstrated essential evidentiary value. Namely, Trooper Richard Nuttall testified that he took the photographs at the autopsy, and he described the injuries that the decedent sustained. (TT 488-492). The forensic pathologist, Dr. Cyril Wecht, also testified relative to the exhibits. Dr. Wecht testified to the procedure of how an autopsy is conducted. (TT 582-583.) Additionally, Dr. Wecht used some of the photographs to more specifically explain the nature of the victim's injuries to the jury. (TT 586-604). These photographs were properly admitted, and [Appellant] is not entitled to a new trial on this basis.

- 10 -

Trial Court Opinion, 11/3/15, at 6. Thus, on the basis of the analysis stated above and our review of the photographs, which we have not found to be inflammatory, we conclude that Appellant's claim lacks merit.

In his second issue, Appellant argues that the trial court erred in failing to grant his motion for a new trial based on the weight of the evidence. Appellant's Brief at 14-15. Specifically, Appellant contends that the verdict reflects that the jury ignored evidence that he was acting in self-defense at the time of the murder.

In *Commonwealth v. Clay*, 64 A.3d 1049 (Pa. 2013), our Supreme Court set forth the following standards to be employed in addressing challenges to the weight of the evidence:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Widmer*, 560 Pa. 308, 319, 744 A.2d 745, 751-[7]52 (2000); *Commonwealth v. Brown*, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. *Widmer*, 560 A.2d at 319-20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" *Id*. at 320, 744 A.2d at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Brown*, 538 Pa. at 435, 648 A.2d at 1189.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* **Brown**, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. **Commonwealth v. Farquharson**, 467 Pa. 50, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

**Widmer**, 560 Pa. at 321-[3]22, 744 A.2d at 753 (emphasis added).

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

**Widmer**, 560 A.2d at 322, 744 A.2d at 753 (quoting **Coker v. S.M. Flickinger Co.**, 533 Pa. 441, 447, 625 A.2d 1181, 1184-[11]85 (1993)).

- 12 -

*Clay*, 64 A.3d at 1054-1055. "Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Commonwealth v. Diggs*, 949 A.2d 873, 879-880 (Pa. 2008).

The jury, sitting as the finder of fact, chose to believe the evidence presented by the Commonwealth and to disregard the evidence of self-defense presented by Appellant, as was its right. The trial court aptly explained:

> Based upon this Court's review of the entire record, this Court does not find that the jury's verdict is so contrary to the evidence as to shock this Court's sense of justice. The jury was certainly capable of determining whether to believe all, part, or none of the evidence with respect to whether the Commonwealth met its burden and to determine the credibility of each witness. In the present case, this Court finds that all of the evidence that the jurors had available them was overwhelmingly in support of the verdict rendered. Through the duration of the trial, the jurors considered the following testimony: Trooper Lanham who testified that [Appellant] drove entirely out of the way to get back home on August 7, 2013; the testimony from Trooper Lanham and Mr. Ritenour who testified that [Appellant] asked Mr. Russo and Mr. Ritenour to lie for him; [Appellant's] recorded confession; Mr. Bard's testimony regarding cell phone pinging; and Mr. Zevoteck's testimony that showed that [Appellant] attempted to lure Mr. Weygandt out on a prior occasion. It is the opinion of this Court that all of these relevant facts clearly support the jury's finding that [Appellant] acted willfully, deliberately and with premeditation in bringing about the death of Mr. Weygandt. Accordingly, it is the opinion of this Court that the jury's verdict was not against the weight of the evidence and that the verdict should stand.

Trial Court Opinion, 11/3/15, at 7. Thus, we decline Appellant's invitation to assume the role of fact finder and reweigh the evidence. Accordingly, we

conclude that the trial court did not abuse its discretion in determining that Appellant's weight of the evidence claim lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/22/2016