## Commonwealth v. Parker

C.P. of Allegheny County, nos. CC9315203 and CC9315290.

*Thomas F. Merrick,* for the Commonwealth.
*Stanton D. Levenson,* for the defendant.

DAUER, *J.,* March 8, 1996—Defendant, Allen T. Parker, appeals from judgment of sentence. He was charged at CC9315203 with criminal homicide (section 2501 of the Crimes Code). He was also charged at CC9315290 with criminal conspiracy (section 903 of the Crimes Code) at Counts One and Two and firearm not to be carried without a license at Count Three in violation of the Uniform Firearms Act (section 6106).

Defendant first appeared before this court on February 9, 1995 at which time he entered a plea of not guilty. Trial by jury then commenced, but on February 16, 1995 defendant's motion for a mistrial was granted. His "motion to dismiss criminal information for violation of double jeopardy due to prosecutorial misconduct" was denied.

Trial by jury began anew on May 8, 1995 and, on May 12, 1995, the jury returned with a verdict of guilty to third-degree murder at CC9315203 and guilty at CC9315290 to the criminal conspiracy charge at Count Two. The jury found the defendant not guilty of the criminal conspiracy charge at Count One and not guilty to the charge of firearm not to be carried without a license at Count Three.

On June 6, 1995 defendant was sentenced to a term of imprisonment on the criminal homicide count of not less than 10 nor more than 20 years. An additional consecutive five to 10 year term of imprisonment was imposed on the criminal conspiracy count.

On appeal, defendant first asserts the court erred in denying his "motion to dismiss criminal information for violation of double jeopardy due to prosecutorial misconduct." A separate opinion by the court dated April 29, 1995 addresses this issue. That opinion was filed by the court and is part of the record proceedings in this matter.

Next, defendant claims the evidence at trial was insufficient to prove the third-degree murder and criminal conspiracy convictions of defendant, either as a direct participant or as an accomplice. Evidence produced at trial belies this claim:

The incident in question took place on May 7, 1993 at about 6:30 p.m. at the Northview Heights ball field located on the North Side section of the City of Pittsburgh. Two rival local street gangs known as the Original Gangsters and Hoodtown were involved. In execution style killings, Original Gangster member James Jarrett was shot to death, and Michael Martin was bludgeoned to death by Hoodtown members using ball bats. A third Original Gangster, Vivarion Roberts, was shot twice but survived.

The criminal homicide count against defendant involved the shooting death of James Jarrett. The criminal conspiracy count charged that defendant and eight Hoodtown co-conspirators conspired to commit the crime of aggravated assault on the three Original Gangster victims.[1]

Vivarion Roberts, the main Commonwealth witness, testified that he, Michael Martin and James Jarrett were best friends. The three friends knew there was a softball game at Northview Heights field on the day in question. They were at the field earlier in the day and then left to buy beer. Subsequently, they, along with other members of the Original Gangsters, returned to the Northview Heights ball field. They began to drink their beer, when police in a paddy wagon, drawn by loud noise of music, investigated the group. At that point, Roberts, Jarrett

---

1. The co-conspirators, all Hoodtown gang members, included Anthony Lee, Norman Daniels, Keith Hughes, James Guyton, Steven Grier, James Youngblood, Kenon Sayles and Gerald Thomas.

and Martin moved off in the direction of the playing field. About 15 minutes later they noticed a gray Chevy Malibu and red Cadillac El Dorado pull up, each with a load of Hoodtown gang members. Roberts said "there go them niggers" referring to the Hoodtown. (T-160.) The three friends moved towards the backstop as members of the Hoodtown exited the cars and moved towards them.

Roberts, who knew the Hoodtown gang, immediately recognized Allen Parker, Keith Hughes, Norman Daniels, Steve Grier, Kenon Sayles, Anthony Lee, Kenny Coates, Nate Patton and J.R. Youngblood. The owner of the Cadillac, Percy Kenney was not present.

Roberts testified that the Hoodtown "started showing us their guns, talking shit." (T-166.) Steve Grier, brandishing his gun said to Roberts "you're fucked up now." (T-167.) Roberts then moved onto the infield where he began fighting with J.R. Youngblood. Roberts testified "We started tussling. My shirt got pulled over my head and I heard shots." (T-170.)

Roberts righted his shirt and started running towards first base. He looked back to see if anyone was chasing him and saw James Jarrett lying on the ground on the third base side. Norman Daniels, Keith Hughes, Steve Grier and defendant were standing over Jarrett holding their guns. Parker was pointing his gun down at Jarrett. In fact, they all had their guns pointing at him.

At that point, Steve Grier who had followed Roberts said "you lose" and began shooting. Roberts was hit in both legs and fell to the 'ground. (T-176-77.) While on the ground he looked towards the pitcher's mound, between first and second base, and observed Michael Martin laying on the ground. Kenon Sayles and Anthony

Lee were standing over him brandishing baseball bats above their heads as if they were going to swing them.

Just then, a lady came along and covered Roberts using her body to protect him.

Roberts' testimony was corroborated by one Darnell Montgomery who happened to be at the Northview Heights ball field to play in a softball game. Montgomery was standing near the backstop when the game was about to begin. He noticed two men come from the first base side of the field onto the field and begin fighting and scuffling. He then noticed a third man come from behind the backstop area onto the field and proceed in the direction of the two men. The third man (obviously James Jarrett) was carrying a bat over his back.

Another man said "where are you going with that fucking bat?" The third man then changed direction and headed toward the third base line. (T-68.) Montgomery testified: "Well, the four to five gentlemen that pursued the gentleman with the bat came onto the field again from the backstop area and it appeared that they formed what I would call a firing line like you would see in a movie. And at that time guns were drawn and he began to move across the field." (T-70.)

He further testified: "Once the firing line was formed and the gentlemen began to move up the third base line and the guns were drawn, immediately after the guns being drawn, again, I moved away from the backstop completely and headed towards the grassy area in the outfield. As I began to do that, I heard gunshots." (T-73-74.)

All of the men in the firing line, whether it was four or five men, had guns. Each man held the gun outstretched in front of him as if he were going to

use it. The guns were pointed in the direction of the man carrying the bat.

Montgomery heard more than five shots but could not state the exact number. After Montgomery retreated to the outfield, he turned and observed a man lying on the ground on the third base side of the infield. He saw another man between first and second base being beaten by men using baseball bats. At least two men, possibly three, were beating on him, bringing the bats from overhead and striking him all over his body. The men were young black males.

The men who formed the firing line left the field in the same manner they entered the field.

Montgomery returned to the infield, stopped at the pitcher's mound and saw that the man lying there had blood coming from his mouth, nose and ears (Michael Martin). He observed the man on the third base sideline facedown with a bullet wound to the right of the shoulder blade (James Jarrett).

As to the identification of Allen Parker, Montgomery testified:

"Q. All right. Now, Mr. Montgomery, what I would like you to do is, I am just going to ask you if you see anyone in the room that you in any way recognize with regard to the incident that you have described on May 7, 1993.

"A. Yes.

"Q. And would you please point to that person, whoever it is, and tell us the manner in which you recognize him?

"A. The defendant (indicating).

"Q. You're referring to Allen Parker?

"A. Yes.

"Q. How, if, in any way, do you recognize him? To what degree do you recognize him as having been involved?

"A. To what degree?

"Q. Just explain how it is that you recognize him.

"A. I do believe, from the best of my recollection of that day, that he is one of the gentlemen that was in the firing line.

"Q. Now, are you stating that with certainty or something less?

"A. 100 percent certainty? Is that what you're asking me?

"Q. Uh-huh.

"A. I'm not 100 percent sure that he was one of the gentlemen in the firing line.

"Q. Well just fully explain for the jury then exactly what you mean. Make sure that they understand your level of certainty with regard to saying that you believe Allen Parker was in the firing line.

"A. Well, in regards to believing that Allen Parker was in the firing line, if we would have done it a month or two after the incident happened, I may have been 100 percent sure. That was over two years ago. So the degree of certainty actually decreases, but I'm at least 50 percent sure that Mr. Parker was one of the gentlemen there." (T-82-83.)

Percy Kenney, owner of the red Cadillac El Dorado, testified he left town four days before the incident but left his car in the custody of Parker. The car was subsequently returned to Kenney by the Pittsburgh Police.

Forensic Pathologist Leon Rozin testified that the cause of death of James Jarrett was a gunshot wound to the thorax which perforated his heart. He also testified

that the two bullets that entered Jarrett's body were fired from the back.

As to Michael Martin, the doctor testified that his right ear was lacerated "like part of the ear was absent." (T-366.) There was a fracture of the humerus and several fractures of the skull. He also suffered 10 broken ribs. The official cause of death was blunt force trauma to the head and chest. The wounds to Martin were consistent with wounds suffered by an individual who had been repeatedly struck with a blunt force instrument consistent with that of a baseball bat.

Defendant provided a vehicle by which Hoodtown gang members arrived at the scene. He was identified as one of four or five assailants who entered upon the ball field in a firing line and he was identified as standing over James Jarrett pointing his gun down at Jarrett. The testimony of Darnell Montgomery clearly established that all of the men in the firing line pursued James Jarrett with guns drawn. Montgomery was not 100 percent certain that defendant was one of those four or five men pursuing Jarrett, but Vivarion Roberts was certain and so testified. The manner in which the men entered and then exited the ball field area, as a group, was further evidence of their complicity. The evidence that defendant was involved in the murder of James Jarrett and in the conspiracy against all three victims was proven beyond a reasonable doubt.

Lastly, defendant claims the verdicts entered were against the weight of the evidence. Defendant did not file any post-verdict motions. Thus, this issue is being raised for the first time on appeal. The law applicable here was most recently reaffirmed by our Superior Court in *Commonwealth v. Hodge,* 441 Pa. Super. 653, 659, 658 A.2d 386, 389 (1995):

"In *Commonwealth v. Brown,* 538 Pa. 410, 434-38, 648 A.2d 1177, 1189-91 (1994), the Pennsylvania Supreme Court made clear that challenges to the weight of the evidence must first be presented to the trial court. An appellate court may only review the trial court's exercise of discretion in granting or denying a new trial on grounds that the verdict was contrary to the weight of the evidence; it may not address 'the underlying question whether the verdict is against the weight of evidence.' *Id.* at 435, 648 A.2d at 1189."

Since the issue of weight of the evidence was not raised with the trial court, it has been waived for this appeal.

For the reasons stated herein, defendant's appeal from judgment of sentence should be denied.