J-S02034-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TYREE WILSON | |
| Appellant | No. 940 EDA 2014 |

Appeal from the Judgment of Sentence of May 9, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at Nos.: CP-51-CR-0007351-2009
CP-51-CR-0007352-2009

BEFORE:  MUNDY, J., OLSON, J., and WECHT, J.

MEMORANDUM BY WECHT, J.:                **FILED FEBRUARY 17, 2015**

Tyree Wilson appeals the judgment of sentence entered on May 9, 2012.  We affirm.

The trial court set forth the pertinent factual history of this case as follows:

> [At trial, on May 7, 2012,] Philadelphia Police Officer Robert W. Ingram testified that on Monday, February 23rd, 2009, at approximately 10:45 p.m., he responded to [a] police radio call of a shooting in the area of 1300 10th Street, Philadelphia. Officer Ingram was the first unit on scene; he observed a red Ford Taurus parked on the curb, he observed bullet strike marks on the driver's side of the car, broken glass littering the ground by the driver's side window, and bullet casings strewn nearby on the ground.  The area around the vehicle was well lit.  Officer Ingram observed the two decedents, Hassan Baldwin and Daheem White, lying slumped over and motionless in the driver's seat and front passenger seat, respectively.  Officer Ingram was unable to obtain signs of life for either decedent.  Additional police units and an ambulance arrived at the scene at approximately 10:55 p.m. to revive both decedents, without

success. By approximately 11:06 p.m. both Mr. Baldwin and Mr. White had already been pronounced dead by paramedics.

Monique Lewis testified that on the night of February 23, 2009, she was walking with her niece, Dominque Parker, from an Asian food store near Girard Avenue, and returning to her residence in the Harrison Projects, at 10th and Thompson Streets. Ms. Lewis stated that in the year preceding the shooting, she saw [Wilson] on a semi-regular basis and that [Wilson] had been inside her apartment a fair number of times. Ms. Lewis and her niece were positioned across the street from the Harrison projects when Ms. Lewis witnessed [Wilson], wearing a dark-colored and hooded sweatshirt with the hood down, come from the front door of the Harrison Projects. [Wilson] then walked around the back of a red vehicle parked on the curb and, standing approximately within 2.5 feet from the driver's side door, fired a gun several times toward the driver's side window, which was in an upright position. Ms. Lewis and her niece were petrified and remained in place for a few moments; then both women ran together toward Girard Avenue, while [Wilson] ran in the opposite direction away from Ms. Lewis.

Ms. Lewis contacted the Philadelphia Homicide Detectives, and on February 24, 2009, at 11:30 a.m., the morning after the shooting, she gave a statement to Philadelphia Homicide Detectives Morton and Holmes; in that statement she unequivocally identified [Wilson] from an eight-person photo array as the shooter. Ms. Lewis also testified that she identified [Wilson] as the shooter on or about June 3, 2009, at the preliminary hearing in the instant matter.

Police Officer Michael Maresca, Badge No. 5284, currently assigned to the Philadelphia Police Crime Scene Unit, testified that on February 23, 2009, he responded to the area of 1350 North 10th Street at approximately 11:27 p.m. Upon arriving at the scene of the shooting, Officer Maresca observed both deceased victims, having suffered gunshot wounds, in the front of a red vehicle. Officer Maresca recovered ten .40 caliber fired cartridge casings [("FCC")], all with similar markings and coloration. All ten of these casings were located on the ground, on the driver's side of the red vehicle, within six to eight feet of the vehicle, suggesting that the shooter was standing "in front of the driver's side and the FCCs would be kicking back to the right approximately six to eight feet." Officer Maresca also recovered one 9-millimeter fired cartridge casing, located further away

from the vehicle and in a different location from the ten .40 caliber casings. The 9-millimeter casing appeared to be weathered and not associated with the shooting in this case.

Officer Maresca also testified that he observed four bullet strike marks on the driver's side of the red vehicle: one such strike mark at the base of the driver's side window frame, another strike mark at the base of the driver's door frame, another strike mark near the driver's door handle, and another strike mark on the roof of the car, above the driver's door. Officer Maresca also testified that he recovered four copper jacketed projectiles from the vehicle and submitted the same to the Firearms Identification Unit.

Dr. Sam Gulino, an expert in the field of forensic pathology, testified that he examined the bodies of Hassan Baldwin and Daheem White. He testified that Mr. Baldwin had sustained a total of seven gunshot wounds, which caused Mr. Baldwin's death. He testified that Mr. Baldwin's wounds were caused by bullets traveling from the left side of Mr. Baldwin's body toward the right side of his body, all of which was consistent with a shooter firing from the driver's side of the vehicle. Dr. Gulino also noted that Mr. Baldwin had some injuries to his cheek from broken glass.

Dr. Gulino testified that there was no evidence of close range fire on Mr. Baldwin's body, but that if the driver's side window was in the upright position, it would act as a filter and block any potential gunshot residue or stippling from appearing around Mr. Baldwin's wounds (for so long as the driver's side window remained intact). He also opined that the manner of Mr. Baldwin's death was homicide.

Mr. White had sustained two gunshot wounds, one of which alone caused his death. He also testified that there was no evidence of close range gunfire on Mr. White's body and that bullet wounds sustained by Mr. White were consistent with a shooter firing from the driver's side of the car. Dr. Gulino opined that the manner of Mr. White's death was a homicide.

Dr. Gulino testified that he examined the clothing of both Mr. Baldwin and Mr. White and that he did not find any gunpowder or soot on any article of clothing. While no evidence of gunpowder stippling was found on either decedent's skin, Dr. Gulino stated that if the muzzle of a firearm was within two to

three feet of the decedent's skin and the driver's side window was broken, he would expect to see evidence of close range fire.

Police Officer Raymond Andrejczak, an expert in the field of firearms identification, testified that he examined, *inter alia*, nine [] .40 caliber bullets, and ten [] .40 caliber fired cartridge casings recovered during the investigation of the instant manner. Two of the .40 caliber bullets showed evidence of the glass particles; this finding is consistent with those bullets having travelled through glass after being fired. Officer Andrejczak also testified that while he was unable to determine whether any of the nine .40 caliber bullets were fired from the same gun, he was able to determine that all ten [] .40 caliber fired cartridge casings were fired from the same firearm. Officer Andrejczak opined that the positioning of the ten .40 caliber fired cartridge casings at the scene of the shooting was consistent with the typical ejection pattern of a semi-automatic handgun having been fired from the driver's side of the vehicle. No firearm was submitted to Officer Andrejczak for testing.

Trial Court Opinion ("T.C.O."), 8/26/2014, at 2-6 (citations to the notes of testimony and some footnotes omitted).

On May 9, 2012, following a bench trial, the trial court found Wilson guilty of two counts of first-degree murder[1] and one count of possession of an instrument of crime ("PIC").[2] The trial court sentenced Wilson to two consecutive life sentences on the murder convictions, and two and one-half to five years' incarceration on the PIC charge. On May 21, 2012, Wilson filed a timely post-sentence motion. On September 6, 2012, the trial court denied Wilson's post-sentence motion. On March 28, 2014, Wilson was

_____

[1] 18 Pa.C.S. § 2501.

[2] 18 Pa.C.S. § 907.

granted leave to appeal *nunc pro tunc.* On March 29, 2014, Wilson filed a timely notice of appeal. On April 4, 2014, Wilson filed a statement of matters complained pursuant to Pa.R.A.P. 1925(b). On August 26, 2014, the trial court filed its opinion pursuant to Pa.R.A.P. 1925(a).

Wilson raises the following question for our review:

> Did the trial court err in denying [Wilson's] post-sentence motion because [Wilson's] conviction is against the weight of the evidence in that [Wilson] was only identified by one witness who made crucial errors in her testimony?

Brief for Wilson at 4.

We review a weight of the evidence claim for an abuse of discretion. When assessing a weight claim, we apply the following standards:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. ***Commonwealth v. Widmer***, 744 A.2d 745, 751-52 (Pa. 2000); ***Commonwealth v. Brown***, 648 A.2d 1177, 1189 (Pa. 1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. ***Widmer***, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" ***Id.*** (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Brown***, 648 A.2d at 1189.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

>> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of

- 5 -

whether the verdict is against the weight of the evidence. ***Brown***, 648 A.2d at 1189.   Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. ***Commonwealth v. Farquharson***, 354 A.2d 545 (Pa. 1976).   One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Widmer***, 744 A.2d at 753 (emphasis added).

***Commonwealth v. Clay***, 64 A.2d 1049, 1054-55 (Pa. 2013) (citations modified).

Our task in such a challenge is as follows:

To determine whether a trial court's decision constituted a palpable abuse of discretion, an appellate court must examine the record and assess the weight of the evidence; not however, as the trial judge, to determine whether the preponderance of the evidence opposes the verdict, but rather to determine whether the court below in so finding plainly exceeds the limits of judicial discretion and invaded the exclusive domain of the jury.   Where the record adequately supports the trial court, the trial court has acted within the limits of its judicial discretion.

***Brown***, 648 A.2d at 1190 (citation omitted).

Wilson argues that Lewis' testimony, which placed Wilson within two and one-half feet of the vehicle, was so contrary to the ballistics evidence as to shock the conscience of the court and require a new trial.   Wilson first contends that the lack of stippling on the bodies of Mr. Baldwin and Mr. White (the "Decedents") is inconsistent with Lewis' testimony, thereby

casting doubt upon the credibility of her entire testimony. Wilson next argues that the location of the bullet strike marks on the red Ford Taurus is also inconsistent with Lewis' testimony, again casting doubt upon Lewis' entire testimony. Brief for Wilson at 10-12. Wilson maintains that these inconsistences create rebuttable errors as to the distance that the shooter was from the car in which the Decedents were sitting, thereby undermining her entire testimony. Therefore, Wilson argues that it was error for the trial court to deny his Post-Sentence Motion. Brief for Wilson at 8.

The Commonwealth responds that Wilson is not entitled to relief. The Commonwealth argues that Wilson improperly ignores key aspects of the expert testimony and physical evidence that bolsters Lewis' testimony. Brief for the Commonwealth at 6. The Commonwealth contends that the trial court's verdict was fully supported by this evidence at trial and did not shock the conscience of the court, as is required for a new trial. Brief for the Commonwealth at 8. Therefore, the Commonwealth argues, the trial court did not abuse its discretion in denying Wilson's motion. Brief for the Commonwealth at 11.

In analyzing the facts presented, the trial court found Lewis' testimony largely consistent with the ballistics evidence. The court acknowledged that the upright position of the glass window between the gun and the victims' skin could have prevented any stippling from occurring. The court also noted that a lack of stippling on the Decedents' skin could be a result of Wilson standing just outside the two-to-three foot range required for the

stippling phenomenon to occur. T.C.O. at 8-9. Additionally, Lewis never claimed to have witnessed the bullets enter the vehicle. Therefore, the court found the locations of the bullet marks on the vehicle consistent with Lewis' testimony and the ballistics evidence. T.C.O. at 10. The trial court concluded that the weight of the evidence was not contrary to the verdict and would not shock one's sense of justice.

Having revisited the trial court's findings, we turn now to the record. Lewis testified that, on the night of February 23, 2009, she witnessed Wilson, who was standing approximately two and one-half feet away from the driver's side door, fire multiple rounds into the vehicle where the two Decedents were later found. Notes of Testimony ("N.T.") 5/8/2012, at 10-12, 39. Lewis testified that, on the night in question, she was walking back to her residence in the Harrison Projects. N.T. at 8-9. Lewis stated that she witnessed Wilson come out from the front door of the Harrison Projects and approach the driver side door of a red vehicle that was parked at the curb. *Id.* at 9-13, 39, 43-44. Lewis testified that Wilson, while standing approximately two and one-half feet away from the driver's side door, fired a gun multiple times towards the driver's side window. *Id.* at 10-12, 39. Lewis remained in a petrified state for a moment, and then ran away from the crime scene while Wilson ran in the opposite direction away from Lewis. *Id.* at 14-16, 17-18. On February 24, 2009, at 11:30 a.m., Lewis gave a statement to two Philadelphia homicide detectives in which she unmistakably

identified Wilson as the shooter from an eight-person photo array. *Id.* at 23-24.

Officer Maresca testified that on the night in question he observed both Decedents in the front of a red vehicle having suffered multiple gunshot wounds. *Id.* at 49. Officer Maresca recovered ten .40 caliber cartridges located on the ground within six to eight feet of the driver's side of the vehicle. *Id.* at 50-51, 55. Additionally, Officer Maresca observed four bullet strike marks on the driver's side of the vehicle. *Id.* at 56, 57, 61.

Dr. Gulino, a forensic pathologist, testified that the bullet wounds sustained by both Decedents were consistent with a shooter firing from the driver's side of the car. *Id.* at 89, 92, 96. Dr. Gulino further testified that there was no evidence of stippling marks located around the bullet wounds. *Id.* at 79-80. However, Dr. Gulino added that if the driver's side window was in the upright position, it would act as a filter and prevent any stippling or gunshot residue from appearing. *Id.* Additionally, Dr. Gulino testified that he did not recover any gunpowder or soot on any article of clothing. *Id.* at 101. Dr. Gulino stated that if the muzzle of the firearm was within two to three feet of the Decedent and the driver's side window was broken, he would expect to see evidence of close range fire. *Id.* at 99-100.

Officer Andrejczak, an expert in the field of firearms identification, testified that he recovered cartridge cases at the scene. *Id.* at 14, 17, 29-30. Officer Andrejczak testified that the evidence is consistent with the bullets having travelled through glass. *Id.* at 38. Additionally, he testified

that the positioning of the fired cartridge casings was consistent with bullets travelling from the driver's side of the vehicle. *Id.* at 30.

Wilson's argument relies upon alleged inconsistences between Lewis' testimony and the physical evidence from the crime scene. However, the ballistics evidence corroborated Lewis' testimony. The factfinder was free to believe the testimony presented and to conclude that Wilson was the shooter. The record adequately supports the trial court's verdict, and we find no abuse of discretion. Accordingly, Wilson's weight of the evidence challenge fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/17/2015

- 10 -