J-S27019-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| MARQUISE WALKER-WOMACK | : | |
| Appellant | : | No. 1809 EDA 2016 |

Appeal from the Judgment of Sentence April 29, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007619-2013

BEFORE: GANTMAN, P.J., OTT, J. and PLATT, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED July 3, 2017**

Marquise Walker-Womack appeals from the judgment of sentence imposed on April 29, 2016, in the Court of Common Pleas of Philadelphia County, following his conviction by jury[1] on the charges of first-degree murder, conspiracy, firearms not to be carried without a license, carrying firearms in public in Philadelphia, and possession of an instrument of crime.[2] Walker-Womack, who was fifteen years old at the time of the crimes, received a total sentence of 35 years' to life imprisonment. In this timely

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Walker-Womack and his co-defendant, Warren Stokes, were originally tried in September, 2014. That trial ended with a hung jury. The two were retried in February, 2016, at which time both were convicted of first-degree murder and related charges.

[2] 18 Pa.C.S. §§ 2502(a), 903, 6106(a)(1), 6108, and 907, respectively.

appeal, Walker-Womack claims only that the verdict was against the weight of the evidence.[3] After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

We rely upon the facts as related by the trial court in its Pa.R.A.P. 1925(a) opinion.

On August 5, 2009, Katora Wilson Bush travelled by bus to the 5100 block of Chester Avenue in Southwest Philadelphia from dinner with her daughter, Amirajh Wilson, and her husband, Gerald Bush. Upon disembarking the bus, all three observed an African-American teenager in a black hooded sweatshirt, later identified as the Defendant, Marquise Walker-Womack, following them as they walked southwest along Chester Avenue.

As she travelled home with her family, Katora Wilson Bush observed her son, the decedent Niam Wilson Atif, at the corner near 5117 Chester Avenue talking to his neighbor, Allen Bryant. During Bryant and the decedent's discussion about employment, an unidentified individual walked past the pair shouting, "it's about to go down." Seconds later, Bryant saw the African-American teenager in the black hooded sweatshirt approach the decedent from behind, draw a revolver, and shoot him three times. [Walker-Womack] was fifteen-years-old at the time of the shooting.

Katora Wilson Bush heard the gunfire from her home eight doors away and saw her son lie bleeding on the corner of Chester Avenue and Paxon Street. Gerald Bush and Amirajh Wilson, from Katora Wilson Bush's same vantage point, watched as the teenager fled the scene along Chester Avenue. Neither eyewitness identified [Walker-Womack] as the shooter.

At approximately 11:00 p.m., Philadelphia Police Officers Alexander Montes and Clara Martinez arrived at the scene and observed the decedent laying [sic] in a pool of blood emanating

---

[3] This claim was preserved in a post-sentence motion filed on May 6, 2016.

from a large wound in the back-right side of his head.[4] Officer Martinez spoke to Amirajh Wilson, who described the assailant as a 5'8" African-American male in his teens, wearing a black hood.

According to Philadelphia Deputy Medical Examiner Dr. Albert Chu, and expert in forensic pathology, the decedent sustained three fatal, penetrating gunshot wounds to the left side of his head, the right side of his neck and his center back, respectively. Each bullet penetrated a vital organ, including the brain, jugular vein and the left lung. The medical examiner recovered all three projectiles from the body which were submitted to the Firearms Identification Unit. The decedents' body did not exhibit stippling or any other indications of close-range firing. Dr. Chu concluded, to a reasonable degree of medical certainty, that the manner of death was homicide caused by multiple gunshot wounds.

On October 7, 2009, Philadelphia police engaged in a foot chase with Tyreek Artis, a member of the Harlem Boys gang. Artis led police to an apartment complex at 5403 Harley Terrace and attempted to conceal himself in unit 3A. Unit 3A served as an epicenter for gang-related activity, housing several firearms and approximately sixty drug packets prepared for distribution. Inside, police discovered Artis, gang member Kareem Pittman, and co-defendant Warren Stokes, and recovered a loaded .38 Special revolver.

Officer Jesus Cruz, a ballistics expert with the Philadelphia Firearms Investigation Unit, examined all three projectiles recovered from the decedent's body and determined that all three bullets were fired from a single firearm. Each projectile exhibited "six left twist" rifling markings, an identification characteristic used to match a projectile to the weapon that fired it. Officer Cruz concluded that the projectiles were consistent with having been fired from the .38 Special recovered at 5403

_____

[4] We note the medical examiner testified the wound was penetrating (it did not exit the body), to the left side of the head, moving left to right, downward and a little bit front to back. *See* N.T. Trial, 2/2/2016 at 109-11. The difference in the description of the head wound does not affect the analysis.

Harley Terrace, as the firearm exhibited "six left twist" characteristics.

No more than one week after the murder, [Walker-Womack] bragged to Pittman and Harlem Boys gang member Tayale Shelton that he "put in some work" by killing the decedent. [Walker-Womack] and Stokes told both Pittman and Shelton that Stokes provided the .38 Special Walker-Womack used to kill the decedent. As [Walker-Womack] described the shooting to Pittman, Stokes displayed the firearm used to murder the decedent. [Walker-Womack] further informed Shelton that he shot the decedent at Stokes' behest.

On October 6, 2010, federal authorities indicted Pittman and Shelton pursuant to the Racketeering Influenced and Corrupt Organizations Act ("RICO"). Prior to trial, Pittman and Shelton pled guilty and entered into separate cooperation agreements. [fn]

_____

[Fn] Shelton entered into his guilty plea agreement on April 4, 2012, and Pittman entered into his on April 9, 2012. Both witnesses seek a USSG § 5K1.1 departure from the mandatory minimum sentences attached to their federal charges. Commonwealth Exhibit C-125-1; Commonwealth Exhibit C-126-1.

_____

During an April 18, 2012 interview with Philadelphia homicide Detectives John McNamee and William Kelhower, Pittman explained that Stokes oversaw a splinter organization within the Harlem Boys, known as the Greenway Gorillas, consisting primarily of adolescent members, and that [Walker-Womack], known in the organization as "Littleman," shot the decedent at Stokes' behest. During a May 18, 2012 interview, Shelton told Detectives McNamee and Kelhower that [Walker-Womack] confessed to shooting the decedent on Stokes' orders, as Stokes had been "beefing" with the decedent for some time prior to the shooting. Shelton further explained that the murder weapon was a "community" firearm that Stokes provided to [Walker-Womack].

After his arrest, [Walker-Womack] was incarcerated at the Philadelphia Industrial Correctional Facility ("PICC") in a cell next to one occupied by Thomas Adams. In November 2014, while

both Adams and [Walker-Womack] were incarcerated, [Walker-Womack] confessed to Adams that he shot the decedent three times with a .38 Special revolver.

At trial, both Pittman and Shelton described [Walker-Womack] as a member of the Greenway Gorillas, which served as a feeder group to the Harlem Boys gang that included Pittman, Shelton, and Stokes as members. Pittman and Shelton both testified that Greenway Gorillas members seeking to advance within the gang committed murders to impress Harlem Boys associates. [Walker-Womack] in particular looked up to Stokes and sought to earn his respect and approval.

Trial Court Opinion, 7/25/2016, at 2-5 (citations to record omitted).

Against this factual background, Walker-Womack argues the possible sentence reductions available to Pittman and Shelton "made it virtually impossible for them not to fabricate their testimony"[5] and Thomas Adams' recantation of his prior statement to the police on the witness stand, renders the guilty verdict against the weight of the evidence. Our standard of review for a challenge to the weight of the evidence is well settled.

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Widmer*, 560 Pa. 308, 319, 744 A.2d 745, 751-52 (2000); *Commonwealth v. Brown*, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. *Widmer*, 560 Pa. at 319-20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.' " *Id.* at 320, 744 A.2d at 752 (citation omitted). It has often been stated that

---

[5] *See* Appellant's Brief at 4.

"a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Brown*, 538 Pa. at 435, 648 A.2d at 1189.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* *Brown*, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Widmer*, 560 Pa. at 321-22, 744 A.2d at 753 (emphasis added).

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

> *Widmer*, 560 Pa. at 322, 744 A.2d at 753 (quoting *Coker v. S.M. Flickinger Co.*, 533 Pa. 441, 447, 625 A.2d 1181, 1184-85 (1993)).

*Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013).

In denying Walker-Womack's post-sentence motion for a new trial based upon his weight of the evidence claim, the Honorable Barbara A. McDermott reasoned:

> [Walker-Womack] argues that Pittman['s] and Shelton's testimony is unbelievable because each witness agreed to testify against [Walker-Womack] in exchange for a USSG § 5K1.1 downward departure from the Federal Sentencing Guidelines. At the time of trial, both Pittman and Shelton awaited sentencing for their RICO convictions. At trial, both Pittman and Shelton testified that [Walker-Womack] murdered the decedent at the behest of his co-defendant, Warren Stokes, in order to advance within the Harlem Boys organization. During cross-examination, trial counsel sought to impeach both Pittman['s] and Shelton's credibility by thoroughly interrogating each witness about his cooperation agreement with the federal government. Through this line of questioning, trial counsel successfully elicited to the jury that both witnesses faced a maximum penalty of life imprisonment and that a USSG § 5K1.1 departure afforded them the possibility of early release. Ultimately, the jury had an opportunity to observe the witnesses and assess their credibility as they maintained and repeated their version of events.
>
> Pittman['s] and Shelton's testimony is corroborated by the eyewitness testimony of Allen Bryant, Katora Wilson Bush, Gerald Bush and Amirajh Wilson. Katora Wilson Bush testified that a person fitting [Walker-Womack's] description dressed in a black hoodie was pacing near decedent's location immediately prior to the murder. Bryant and Amirajh Wilson each testified that a skinny teenager, approximately 5'7" or 5'8" and wearing a black hoodie, approached the decedent from behind and short him three times, including in the back of the head. Bryant further testified that there was animosity between the decedent and residents of another block. Katora Wilson Bush, Gerald Bush, and Amirajh Wilson each witnessed a person fitting [Walker-Womack's] description flee the murder scene. That the

jury chose to believe Pittman['s] and Shelton's testimony, especially considering the corroborating evidence, does not shock this Court's conscience. *See Commonwealth v. Holley*, 945 A.2d 241, 246 (Pa. Super. 2008) (the finder of fact is free to believe the testimony of Commonwealth witnesses and free to disregard the testimony of others).

[Walker-Womack] further avers that, because Thomas Adams recanted his out of court police statement on the witness stand, that his verdict is against the weight of the evidence. In November 2014, Adams was incarcerated in Cell 49 of the Philadelphia Industrial Correctional Center, next to [Walker-Womack] at Cell 50. At that time, [Walker-Womack] told Adams the he was incarcerated for a shooting and that, on the night of the murder, [Walker-Womack] wore a black hoodie pulled up over his head and ambushed the decedent, shooting him in the head, neck, and back with a .38 Special revolver. These conversations were memorialized in Adams' police statement. At trial, Adams claimed that he fabricated his entire statement in order to secure favorable treatment by law enforcement, having used [Walker-Womack's] discovery to aid his narrative.

The jury was free to believe Adams' statement to police, notwithstanding his attempt to recant at trial. Adams' out of court statement that [Walker-Womack] wore a black hoodie before shooting the decedent is corroborated by Allen Bryant's eyewitness testimony, and Pittman['s] and Shelton's testimony corroborates the type of weapon [Walker-Womack] used. Even if the jury chose not to believe Adams' statement, the combined weight of Pittman['s], Shelton['s], and the eyewitnesses' testimony strongly supports a guilty verdict. Again, the jury's verdict does not shock the Court's sense of justice.

Trial Court Opinion, 7/25/2016, at 6-8 (citations to record omitted).

Having independently reviewed the certified record, we find no abuse of discretion in the trial court's ruling. It bears repeating that the jurors heard all the impeachment testimony Walker-Womack cites in this appeal and opted to reject it, as they are permitted to do.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/3/2017</u>