J-S43023-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| GENE LIVINGSTON | |
| Appellant | No. 1749 WDA 2016 |

Appeal from the Judgment of Sentence Dated October 19, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0002858-2016

BEFORE: STABILE, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED NOVEMBER 15, 2017**

Appellant, Gene Livingston, appeals from the judgment of sentence imposed after the trial court convicted him of two violations of the Uniform Firearms Act.[1]  We affirm.

The trial court stated its factual findings:

Jeremy Brentley, an armed guard for the Housing Authority, testified that on the evening of September 5, 2015, he was working in the 1700 block of Belleau Drive in the Fineview area of the City of Pittsburgh.  During his shift, his attention was drawn to a vehicle that had one male, who was later identified as [Appellant], sitting in the back seat of the car.  A second male, later identified as Scott Cutler, approached the car and engaged [Appellant] in conversation.  [Appellant] then exited the vehicle, and began to walk with Mr. Cutler.  [Appellant] then removed a firearm from his waist area and handed it to Mr. Cutler, who proceeded to discharge the firearm at a wall.  At that point, Mr. Brentley drew his firearm and ordered [Appellant] and Mr. Cutler

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 6105(a)(1) and 6106(a)(1).

to the ground. Mr. Cutler complied, but [Appellant] was last seen by Mr. Brentley leaning on a railing in between two buildings.

Adam Van Houten, who is an armed security guard for the Housing Authority, was working with Mr. Brentley on the night of September 5, 2015. Mr. Van Houten testified that he witnessed [Appellant] "pass a black semi-automatic handgun to Mr. Cutler, before they walked between the two buildings in the 1700-block; which at that point Mr. Cutler fired approximately four to five rounds into the occupied structure, which has a brick wall." Mr. Van Houten noticed that [Appellant] was bleeding, he told [Appellant] to stay there, but [Appellant] fled the scene down a stair case that led to Letsche Street. Mr. Van Houten recovered the firearm from the area where Mr. Cutler was standing. The firearm was tested and found to be in good working condition.

City of Pittsburgh Police Officer Rufus Jones testified that he was working night felony for the City on September 5, 2015. He was called regarding the incident on Belleau Street, and came upon Pittsburgh EMS on Letsche Street, who found a man who had been shot. He followed the blood trail that led to the back of Belleau Drive. Officer Jones found and collected five shell casings from the area of Belleau Street where this incident occurred. All of these casings were tested for fingerprints, but were negative. This is not uncommon when a bullet is fired, as finger oil is burnt when the firearm discharges.

Lastly, [Appellant] pled nolo contender[e] to third degree murder on February 25, 2004 [and therefore was a convicted felon when he carried the firearm], and did not have a license to carry a concealed firearm.

Trial Court Opinion, 3/27/17, at 3-4 (citations to notes of testimony omitted).

At the conclusion of trial on October 19, 2016, the court sentenced Appellant to 2½ to 5 years' incarceration for possessing a firearm while prohibited from doing so under the Uniform Firearms Act. The court imposed no further penalty for the charge of possessing a firearm without a

license.[2] Appellant filed timely post-sentence motions on October 26, 2016, in which he claimed that his convictions were against the weight of the evidence presented at trial. The trial court denied the post-sentence motions on November 1, 2016. Appellant filed a timely notice of appeal on November 16, 2016.

Appellant presents a single issue for our review:

Whether the trial court abused its discretion when it afforded significant weight to the testimony of the security guards and thus finding [Appellant] guilty of all charges, when that testimony was the only evidence connecting [Appellant] to the firearm and was contradicted by the video surveillance of the event, and other witnesses[?]

Appellant's Brief at 3.

In addressing appellate review of a weight claim, the Supreme Court has explained:

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Widmer*, 560 Pa. 308, 319, 744 A.2d 745, 751–52 (2000); *Commonwealth v. Brown*, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. *Widmer,* 560 Pa. at 319–20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.' " *Id.* at 320, 744 A.2d at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and

_____

[2] Appellant waived his right to defer sentencing for the preparation of a pre-sentence report and chose to proceed directly to sentencing. *See* N.T., 10/18-19/16, at 103.

- 3 -

the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Brown***, 538 Pa. at 435, 648 A.2d at 1189.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* ***Brown***, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. ***Commonwealth v. Farquharson***, 467 Pa. 50, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Widmer***, 560 Pa. at 321–22, 744 A.2d at 753 (emphasis added).

> This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

***Widmer***, 560 Pa. at 322, 744 A.2d at 753 (quoting ***Coker v. S.M. Flickinger Co.***, 533 Pa. 441, 447, 625 A.2d 1181, 1184–85 (1993)).

- 4 -

*Com. v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013).

Appellant was convicted of unlawfully possessing a firearm in violation of Section 6105 of the Uniform Firearms Act, which provides:

**(a) Offense defined. —**

(1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

. . .

**(b) Enumerated offenses. —** The following offenses shall apply to subsection (a):

. . .

Section 2502 (relating to murder).

. . .

18 Pa. C.S. § 6105.[3] Appellant also was convicted of possessing a firearm without a license in violation of Section 6106(a)(1) of the Act:

. . . any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S. § 6106(a)(1).

Appellant contends that the weight of the evidence did not support the trial court's finding that he possessed a firearm on September 5, 2015, and therefore did not support his convictions. He argues that his convictions

---

[3] Appellant does not contest that his third-degree murder conviction in 2004 disqualified him from possessing a firearm under this section.

"should shock the conscience of the court" because the evidence that he possessed a firearm was "meager." Appellant's Brief at 9. He challenges the security guards' testimony that he possessed a firearm and contends that the guards' testimony is inconsistent with video evidence from 1:00 a.m. on September 5, 2015, that was presented by the Commonwealth.[4]

As noted above, it is not for this Court to determine whether the verdict is against the weight of the evidence; our review of Appellant's weight claim is a review of the trial court's exercise of its discretion to deny that claim. In assailing the trial court's exercise of its discretion, Appellant states that "[t]he only evidence presented at trial tying [A]ppellant to the firearm was the eyewitness statements from the security guards," which were "wholly inconsistent with the video evidence presented at trial." *Id.* Appellant references the security guards' testimony that they observed him from a distance of "two to three car lengths in a dark area." *Id.* at 10. He asserts that the video shows "the space between [Appellant] and Mr. Cutler was so large as to preclude [Appellant from] being able to reach across [to Mr. Cutler to hand him the gun] without extraordinary effort." *Id.* at 12. Appellant also references his trial testimony, as well as that of Mr. Cutler,

---

[4] At trial, counsel stipulated to the video's authenticity, but never stated the source(s) of the video. N.T., 10/18-19/17, at 16. The video contains various frames labeled with street views, for example, "1711 Belleau Rear" and "Management Office-Belleau Side." The Commonwealth states that the parties entered into "an agreement that the video that was played at trial be made a part of the certified record on appeal." Commonwealth Brief at 12 n4.

that Appellant never possessed a firearm, which Mr. Cutler said he found and showed to Appellant immediately prior to the firearm discharging. *Id.* at 11-12. Finally, Appellant notes that there was no forensic or physical evidence linking him to the firearm.

The Commonwealth states that the trial court properly assessed the credibility of the witnesses and "was certainly permitted to reject the defense witnesses' testimony." Commonwealth Brief at 7. The Commonwealth asserts that the trial court's findings "were not weakened in any way by video evidence that captured a portion of events of that night, as that evidence merely showed two male figures in close proximity to one another walking away from the camera." *Id.* With regard to physical and forensic evidence of Appellant's firearm possession, the Commonwealth notes that absence of defendant's fingerprints is not *per se* exculpatory and "might be explained by any number of reasons." *Id.* at 13.

The Commonwealth presented three witnesses at trial. Jeremy Brentley stated that he was working as an armed security guard for the City of Pittsburgh Housing Authority on September 5, 2015, when he noticed Appellant sitting alone in the back seat of a parked vehicle on Belleau Drive.[5] N.T., 10/18-19/16, at 9-10. He then observed another male, later identified as Scott Cutler, approach the car and talk with Appellant. *Id.* He stated that the two men then walked together away from the car, "crossed the

---

[5] Throughout the record the location is referenced as both Belleau "Drive" and Belleau "Street."

street, and once they got onto the sidewalk and by the grass," he saw Appellant "hand off" a firearm from his waist to Mr. Cutler. *Id.* at 9-10. Mr. Brentley described seeing "a butt of a firearm, and then I s[aw] the whole firearm come from [Appellant's] hands, and go into Mr. Cutler's hands." *Id.* at 11. He testified:

> [Another security guard, Mr. Van Houten] was facing the opposite way of me. He s[aw] when [Appellant] had actually handed off the firearm, and I told [him] that hey, I think that's a firearm. And then he looked and we both looked and it was a firearm. And that's when we started to — we drew our weapons and started to give verbal commands to Mr. Cutler while he was actually firing into the building.

*Id.* at 12. The Commonwealth introduced, with no objection from Appellant, a picture of the 1700 block of Belleau Street, where the incident occurred. *Id.* at 12; Commonwealth Exhibit 1. While looking at the picture, Mr. Brentley reiterated:

> They walked across the street, we s[aw] the handoff about right here; and then that's when I told [Mr. Van Houten] hey, there is a firearm. And then once we determined it was a firearm, by that time they were down there [Mr. Cutler] was shooting into the wall as we were drawing our weapons and making our way down.

*Id.* at 14. Mr. Brentley stated that after he and Mr. Van Houten called to the men, Mr. Cutler dropped the firearm and laid on the ground, and Appellant, who had been leaning on a railing, attempted to leave the area. *Id.* at 15-16.

At this point in the trial, the Commonwealth introduced, again without objection, the video from Belleau Street recorded around 1:00 a.m. N.T.,

- 8 -

10/18-19/16, at 16-19; Commonwealth Exhibit 2. Mr. Brentley testified that although the video showed "two figures" who Mr. Brentley knew from his firsthand experience to be Appellant and Mr. Cutler, he "wouldn't be able to identify" them from the video. *Id.* at 30. Mr. Brentley also testified that the video did not show the transfer of the firearm from Appellant to Mr. Cutler. *Id.*

On cross-examination, Mr. Brentley stated that he saw Appellant hand the gun to Mr. Cutler "[w]hen they get to the sidewalk and are going into the grass." N.T., 10/18-19/16, at 21, 31. He said the men were "not far" from him, "maybe two or three car lengths I would guess." *Id.* at 21-22. He described the exchange of the gun as "very quick." *Id.* at 29.

Next, Adam Van Houten testified that he was working with Mr. Brentley as an armed security guard for the City of Pittsburgh Housing Authority on September 5, 2015, when Mr. Brentley told him that he saw the firearm. N.T., 10/18-19/16, at 34-35. He stated, "[a]s soon as he said that I turned around and witnessed both [Appellant] and Mr. Cutler in possession of a firearm." *Id.* at 35. He added:

> At that point in time I witnessed, after I turned around, after I was alerted by Officer Brentley, [Appellant] passing a black semi-automatic handgun to Mr. Cutler, before they walked between the two buildings in the 1700-block; which at that point Mr. Cutler fired approximately four to five rounds into the occupied structure, which was a brick wall.

*Id.* at 35-36. Mr. Van Houten clarified that he "did not see [Appellant] pull it out of his waistband, but I did see him pass it to Mr. Cutler." *Id.* at 37; ***see***

*also* 51 ("[t]he firearm was actually still in [Appellant]'s hand"). He described the two men as being "within probably a foot, foot and a half" away from one another during the transfer of the firearm. *Id.* He testified that the men were "absolutely" within arms' length of one another, and that he "absolutely" saw a black firearm. *Id.* Mr. Van Houten corroborated Mr. Brentley's testimony that Mr. Cutler subsequently fired the firearm, and dropped the firearm and laid on the ground after Mr. Brentley and Mr. Van Houten told him to do so. *Id.* at 38. He testified that he noticed Appellant "was bleeding profusely" and told him "to stay there, I would go back and get him aid," but when Mr. Van Houten "went back to assist [Appellant], he had fled the scene down the back of the building of 1717 Belleau Drive, toward the city stairs, which would then take him to Letsche Street." *Id.* at 39-40; 49.

The Commonwealth introduced the firearm without objection. N.T., 10/18-19/16, at 41-42; Exhibit 3. Mr. Van Houten identified the firearm as being the one Appellant passed to Mr. Cutler and which was subsequently recovered, along with the firearm's magazine and ammunition, by Mr. Brentley and Mr. Van Houten. *Id.* at 42. The Commonwealth also introduced into evidence without objection a certified record of Appellant's *nolo contendere* plea to third degree murder; a report from the Allegheny County Medical Examiner stating that the recovered firearm was a 40-caliber Smith and Wesson Taurus pistol, tested and found to be in good operating condition; and certification from the Pennsylvania State Police that Appellant

did not have a license to carry a concealed firearm on September 5, 2015. *Id.* at 43; Exhibits 4, 5 and 6.

City of Pittsburgh Police Officer Rufus Jones testified to responding to a report of a "man shot up in the area of Belleau and Letsche Street." N.T., 10/18-19/16, at 54. Officer Jones stated that he took photographs of the scene, including photos of five shell casings. *Id.* at 55-56. He collected the shell casings and, before sending them to the Crime Lab, tested them for fingerprints. Officer Jones explained that obtaining fingerprints from "[s]hell casings [is] really hard, because once a bullet is fired it burns off the oil from the fingerprints." *Id.* at 56-57. He said that, "[u]fortunately, pretty much the only time I have ever gotten fingerprints off a casing, it was [when] police picked it up and dropped it back down." *Id.* at 57. No fingerprints were found on the five shell casings collected by Officer Jones. *Id.* Officer Jones did not test the firearm for fingerprints and explained that fingerprints on firearms are also difficult to obtain. *Id.* at 57-58.

Scott Cutler testified for Appellant.[6] He stated that Appellant was his cousin, and that on September 5, 2015, the two men left a bar and "went up to Belleau" so that Mr. Cutler could buy some marijuana. N.T., 10/18-19/16, at 70-73. He said that Appellant remained in the car and the men "separated." *Id.* at 71. He testified that neither he nor Appellant possessed

---

[6] The trial was continued from October 18, 2016 to October 19, 2016 so that Mr. Cutler could testify with the benefit of counsel, who stated on the record that he advised Mr. Cutler of his right to remain silent and not testify. *Id.* at 68.

a firearm. *Id.* He clarified that Appellant did not hand him a firearm, and he never saw Appellant in possession of a firearm. *Id.* at 72. Mr. Cutler testified that he "found a gun" and asked Appellant "was it real"? *Id.* at 75. He said Appellant "never said nothing. He never touched it, never said nothing." *Id.* Mr. Cutler also testified that he did not shoot the firearm, but "[t]he gun went off." *Id.* at 76.

Appellant testified that on September 5, 2015, he left a bar with his cousin, Cutler, and drove to Belleau Drive. N.T., 10/18-19/16, at 83. He stated that Mr. Cutler left the parked car and he remained in the car listening to music. *Id.* He said that Mr. Cutler returned "half way" and told him "to come here" and "check it out." *Id.* at 84-86. He said he started walking toward Mr. Cutler, who showed him the firearm. *Id.* Appellant denied ever possessing a firearm. *Id.*

At the conclusion of trial and after argument by counsel, the trial court concluded, "having reviewed the exhibits and the evidence, I found the security officers, Officer Brentley and Officer Van Houten, to be credible." N.T., 10/19/16, at 101. The trial court subsequently denied Appellant's weight claim, and explained its rationale:

> In this matter, the only facts that were clearly of greater weight than the other facts was [*sic*] was the testimony of the security guards. Their testimony was entirely consistent with each other and the video evidence that was presented at trial. Mr. Brentley and Mr. Van Houten testified that they witnessed [Appellant] in possession of a firearm and witnessed him hand it directly to Mr. Cutler. Mr. Cutler's testimony that [Appellant] was not in possession of the firearm was not credible.

Trial Court Opinion, 3/27/17, at 4-5.

On this record, we discern no abuse of discretion or error of judgment by the trial court. Contrary to Appellant's argument, the video evidence, which we have reviewed, does not compel a different conclusion. It is undisputed that the video does not show Appellant possessing or handing a firearm to Mr. Cutler, but it is clear that the video did not record all of the events that occurred at the time of the incident. Relying on verbal testimony, the trial court found the two security guards — who testified that the firearm was exchanged but that the exchange was not documented on the video — to be credible; the trial court also found Appellant and Mr. Cutler not credible. Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/15/2017

- 13 -